IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JEANETTE JOHNSON, Individually :   CIVIL ACTION
and on Behalf of All Others   :
Similarly Situated           :
                           :
     v.               :
                           :
RADIAN GROUP, INC., et al.   :   NO. 08-2007

MEMORANDUM

McLaughlin, J.                              July 16, 2009

This putative class action is brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA") on behalf of participants in the Radian Group, Inc. Savings Incentive Plan ("the Radian Plan" or "the Plan"). The members of the putative class are Plan participants who bought Radian common stock ("Radian stock" or "company stock") between November 6, 2006, and the present and whose individualized retirement accounts held company stock or units in the Radian Common Stock Fund ("the Radian Stock Fund"). The defendants are Radian Group, Inc. ("Radian"), various Radian executives, officers, directors, and/or employees, as well as certain committees of Radian executives, officers, directors, and/or employees.

Radian provides credit protection products and financial services to financial institutions, including mortgage lenders. Credit-Based Asset Servicing and Securitization ("C-BASS"), a corporation in which Radian held a 46% equity interest during the class period, invested in the credit risk of

subprime residential mortgages.  C-BASS is alleged to have faced a "monumental liquidity crisis" during the class period as a result of declining conditions in the subprime mortgage market.

The plaintiff claims that the defendants breached their fiduciary duties to prudently and loyally manage the Plan by investing Plan assets in Radian stock and by continuing to offer Radian stock as an investment option in light of deteriorating conditions at C-BASS and in the subprime mortgage market in general.  The plaintiff also claims that the defendants breached their duty not to mislead Plan participants about the risks associated with Radian stock in light of these conditions.  As a result, the plaintiff contends, Radian stock traded at an artificially inflated price during the class period.

In July 2007, Radian publicly announced an impairment of its investment in C-BASS.  The resulting decrease in stock price is alleged to have caused the value of Plan participants' vested retirement benefits to decline.  In this action, the plaintiff, on behalf of herself and others similarly situated, seeks to obligate the defendants to restore to the Plan the losses that resulted from their alleged fiduciary breaches.

The defendants have moved to dismiss the complaint. Their arguments for dismissal are:  (1) that the allegations of the complaint as a whole fail to meet the applicable federal pleading standards; (2) that the complaint does not state a claim

of breach of fiduciary duty; and (3) that, at a minimum, the complaint does not state a claim against various defendants who are not properly considered fiduciaries within the meaning of ERISA.  The Court will grant the defendants' motion and will dismiss the complaint without prejudice.


I.   Facts[1]

         The lead plaintiff in this case is Jeanette Johnson, a participant in the Radian Plan who held company stock in her retirement investment portfolio during the class period.  The defendants are Radian, Sanford A. Ibrahim, C. Robert Quint, the Radian Compensation and Benefits Committee (the "Plan Committee"),[2] Robert E. Croner, Stephen T. Hopkins, Christine M.

---

[1] On a motion to dismiss, courts can consider the allegations of the complaint, exhibits attached to the complaint, matters of public record, and any undisputedly authentic document that a defendant attaches to a motion to dismiss if the plaintiff's claims are based on the document.  Lum v. Bank of Am., 361 F.3d 217, 222 n.3 (3d Cir. 2004); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).  The Court can also take notice of a company's public filings with the SEC.  Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000).  As for the Radian Plan documents offered by the defendants, although the plaintiff asserts that these documents are "self-serving," she has not disputed these documents' authenticity.  In addition, the complaint itself relies on several Plan documents.  The Court will take notice of these documents.  The Court will refer to the defendants' motion to dismiss as "Defs.' Mot." and will refer to the attached Plan documents as "Defs.' Mot. Ex. __."

[2] The plaintiff named as a defendant the "Radian Compensation and Benefits Committee, also known as the Radian Compensation and Human Resources Committee."  The defendants have

Kerly, and John and Jane Does 1-10, who are alleged to be additional Plan fiduciaries.

Radian is a credit enhancement company that offers mortgage insurance and other financial services and products to mortgage lenders and other financial institutions.  For the purposes of ERISA, Radian is the "sponsor" of the Plan at issue. Radian is also alleged to have been named as the "Plan Administrator" for at least a portion of the class period. Compl. ¶¶ 15-18, 76.

At all relevant times, Sanford A. Ibrahim was a member of the Radian Board of Directors and was also the company's CEO. C. Robert Quint was the Executive Vice President and CFO of Radian.  Robert E. Croner was the company's Executive Vice President of Human Resources.  Stephen T. Hopkins is alleged to have been a Radian director, a member of the Radian Credit Committee, and Chair of the Plan Committee.  Christine M. Kerly, although not identified by position in the complaint, is alleged to have signed the Plan's annual report on the company's Form

---

explained that, as a matter of corporate governance, these are two separate entities, and that the Human Resources Committee is not involved in the administration of the Radian Plan.  For the purposes of setting forth the facts of this case, the Court will assume that whatever the proper name of the committee may be as a matter of corporate governance, the plaintiff intends to name as a defendant the committee that was created by the Plan documents to oversee the administration of the Plan.  See Defs.' Mot. Ex. 2 at 2; id. Ex. 4 §§ 9.2-9.3.  To avoid confusion, the Court will refer to this committee as the "Plan Committee."

5500 filed with the Department of Labor on July 3, 2007.
Ibrahim, Quint, Croner, Hopkins, and Kerly are also alleged to
have been members of the Plan Committee.  Compl. ¶¶ 24, 26, 37,
42-43, 47-48, 50-51.

    A.   <u>The Radian Plan</u>

      The Radian Plan is an "employee pension benefit Plan,"
as defined by ERISA.  The Plan is also an "eligible individual
account plan" ("EIAP") within the meaning of ERISA.  <u>See</u> 29
U.S.C. § 1107(d)(3).[3]

      Radian adopted the Plan, which became effective on
November 1, 1992, for the benefit of its eligible employees and
the eligible employees of certain "Participating Companies" in
the United States.  The Plan is a 401(k) employee benefits plan
that provides for elective contributions on the part of the
participating employees, as well as employer matching
contributions.  Participating employees may contribute a certain
percentage of their compensation, and the company will match

---

[3] The parties have not disputed that the Plan qualifies as
an EIAP under ERISA.  An EIAP is an individual account plan which
is (i) a profit-sharing, stock bonus, thrift, or savings plan;
(ii) an employee stock ownership plan ("ESOP"); or (iii) a money
purchase plan which was in existence on September 2, 1974, and
which on such date invested primarily in qualifying employer
securities.  <u>See</u> 29 U.S.C. § 1107(d)(3)(A).

those contributions up to 6% of the participant's eligible
compensation.  Compl. ¶¶ 59, 61-62, 66.

Under the Plan, the company's matching contributions
can be made either in cash or in shares of Radian stock, at the
company's election.  The Plan also states, however, that matching
contributions "shall be invested in Company Stock until such time
as the Participant may transfer all or portion of Company Stock
to one or more" other investment media.  Defs.' Mot. Ex. 4
§ 10.5(c).  Prior to January 1, 2007, the matching contributions
had to remain in company stock until they had vested.  See id.
§ 10.5(d).  Since January 1, 2007, however, Plan participants
have been free to invest all matching contributions in the
investment funds of their choice and are not required to maintain
any portion in the Radian stock fund.  See Defs.' Mot. Ex. 5 at
8.  Specifically, participants were advised in a "Summary of
Material Modifications" that:

> Effective January 1, 2007, you will have an
> immediate right to diversify any of your
> Radian common stock investments (including
> any pre-existing investments in Radian common
> stock) by electing to transfer amounts to
> another investment fund or funds offered
> under the Plan . . . . Previously, the Plan
> limited diversification rights on your Radian
> common stock investments purchased with
> matching contributions . . . . Participants
> should be aware that maintenance of a

> diversified and balanced portfolio of plan
> investments can be a key step towards
> ensuring long term retirement security.

Defs.' Mot. Ex. 9 at 2.

With respect to employee elective contributions, Plan participants are offered a range of investment options that includes more than twenty-five different investment funds.  See Defs.' Mot. Ex. 6 at 25-26.  The Plan does not require participants to invest in Radian stock, but rather, allows Plan participants to maintain individual accounts for which they have a number of investment options, including various investment funds or Radian company stock.  In an "Investment Policy Statement" ("IPS") given to Plan participants, participants were warned that company stock

> is unique among the Plan's other investment
> options in that it invests solely in the common
> shares of Radian Group Inc.  Investment in a
> single security poses both company-specific and
> industry/sector risks for participants.  The value
> of stock can be greatly affected by issues that
> arise within Radian Group Inc. or within its
> industry.  Therefore, it is much more difficult to
> anticipate the risk characteristics of this option
> versus the diversified fund options available
> under the Plan.

Defs.' Mot. Ex. 2 at 7.  In addition, a "Summary Plan Description" ("SPD") given to participants advises them that "investment funds are subject to varying degrees of risk due to

market fluctuations." Defs.' Mot. Ex. 6 at 7. The Plan does not

guarantee any specific level of benefits:

> Contributions to the Radian Group Inc. Stock Fund
> will be used to purchase shares of the common
> stock of Radian Group Inc. at prevailing market
> prices. . . . The Fund is not diversified and its
> performance depends entirely on the performance of
> Radian Group Inc. Common Stock. As with other
> stock, the value of Radian Group Inc. Common Stock
> will fluctuate and your investment in this Fund
> will increase or decrease accordingly.

Id. at 27.

Radian is the sponsor of the Plan within the meaning of

ERISA. Through December 31, 2006, the Plan also designated

Radian as the "Plan Administrator for purposes of ERISA" and for

purposes of satisfying mandatory reporting and disclosure

requirements respecting the establishment or maintenance of the

Plan. Defs.' Mot. Ex. 4 § 9.1.

The Plan also provided for the appointment of a

separate "Administrator" who would be an individual or a

committee of three or more individuals that would serve until

their resignation or dismissal by the company. Id. §§ 9.2-9.3.

In 2006, the appointed "Administrator" was the Plan Committee.

According to the IPS, the Plan Committee would be comprised of

various individuals, including the CEO, COO, Senior Vice

President/CFO, Senior Vice President of Human Resources, and

Executive Vice President and General Counsel. The Plan Committee

was responsible for selecting the investment options offered under the Plan.  See Defs.' Mot. Ex. 2 at 2.

As of January 1, 2007, an amendment to the Plan designated Radian's executive head of Human Resources as both "Plan Administrator" and "Administrator."  As of January 1, 2007, Robert Croner was Radian's Executive Vice President of Human Resources.  See Defs.' Mot. Ex. 5 at 8; Compl. ¶ 42.

B.  Radian, C-BASS, and the Subprime Market

During the class period, Radian's operations were divided into three business segments:  (1) mortgage insurance; (2) financial guaranty; and (3) financial services.  Radian's financial services segment consisted mainly of interests held in Sherman Financial Services Group, LLC ("Sherman"), and C-BASS.  Sherman purchases and services charged-off and bankruptcy plan consumer assets at discounts from national financial institutions and major retail corporations.  Sherman also originates nonprime credit card receivables through a subsidiary.  Compl. ¶¶ 76, 81.

C-BASS, on the other hand, is a mortgage investment and servicing company that invests in the credit risk of subprime residential mortgages.  During the class period, Radian held a 46% equity interest in C-BASS and had invested approximately $500 million in it.  Radian, together with MGIC Investment Corporation

("MGIC"), another provider of private mortgage insurance, owned more than 95% of C-BASS.  Id. ¶¶ 83-85, 107.

The CCAC alleges that prior to and during the class period, the mortgage-backed securities securitized by C-BASS were particularly risky because they were backed by subprime loans, which themselves had become so risky that they were not even rated.  In addition, the largest proportion of mortgages that had been purchased by C-BASS were located in California and Florida, two locations which the New York Times had reported as accounting for about 21% of all mortgages nationally, and 30% of new foreclosures.  Further compounding the riskiness and volatility of C-BASS's assets was the fact that C-BASS did not originate the loans it serviced and securitized, which, according to the plaintiff, increased the risk that these loans were fraudulently originated.  C-BASS also retained the most risky interests in the securitizations it created, including, for example, by accepting the first risk of payment default.  Id. ¶¶ 86, 90-91, 93-94.

Prior to the class period, interest rates began to rise nationally, which adversely affected subprime borrowers' ability to pay and increased the default risk for subprime mortgage loans.  According to the plaintiff, the deterioration of the subprime market led to an actual material increase in mortgage loan defaults, thus significantly impairing the value of C-BASS's subordinated securitized interests.  Because C-BASS had been

10

heavily dependent on bank credit lines for its liquidity, the impaired value of C-BASS's subordinated securitized interests, which had served as the collateral for its bank loans, caused "a monumental liquidity crisis" for C-BASS.  Id. ¶¶ 105-06.

The plaintiff alleges that, despite the danger to its investment in C-BASS, Radian failed to disclose this danger to the Plan or its participants.  This increased the risk of investing in and holding Radian stock in the Plan.  Radian also failed to disclose that its investment in C-BASS was materially impaired or that Radian's lenders had started requiring it to put up more collateral because its assets and investments were impaired.  Instead, it portrayed Radian's investment in C-BASS as strong.  Id. ¶¶ 107-08, 125, 148.

On February 6, 2007, Radian and MGIC announced that they had agreed to merge.  As part of the transaction, Radian and MGIC agreed that they would sell their respective interests in C-BASS.  In addition, upon completion of the merger, Ibrahim would immediately become President and COO of the merged entity. In 2009, he would become the CEO, and in 2010, he would become Chairman.  In addition, Croner would become head of Human Resources at the merged entity.  According to the plaintiff, one of the reasons that Radian did not disclose the problems with its investment in C-BASS is that the merger would have been jeopardized if it had disclosed the truth.  On May 9, 2007,

11

Radian issued a press release announcing that its shareholders
had approved the merger with MGIC.  Id. ¶¶ 127, 129-33.


     C.    <u>Radian's Allegedly Misleading Statements</u>

       The complaint details a series of statements made by
Radian, Ibrahim, and Quint, in various SEC filings and on
conference calls with investors.  The plaintiff alleges that in
these statements, the defendants failed to disclose that Radian's
$468 million investment in C-BASS was materially impaired because
C-BASS was receiving margin calls and C-BASS's investments were
declining in value at a significant rate.  She alleges that these
statements materially overstated the company's financial results
by failing to properly value its investment in C-BASS and by
failing to write-down that investment in a timely fashion.  She
also alleges that Radian misrepresented that, with respect to
financial reporting, the company had adequate internal disclosure
controls in place.  Finally, the plaintiff alleges that Radian's
public filings were incorporated by reference into the Plan
documents.  Through each of these misrepresentations, the
defendants "fostered a positive attitude" toward company stock.
As a result, Plan participants were not informed about the true
risks presented by investing in Radian stock.  Id. ¶¶ 215-20.

       The class period begins on November 6, 2006, when
Radian filed its quarterly Form 10-Q with the SEC.  In that

report, which was signed by defendants Quint and Ibrahim, the
company certified that the report did not contain "any untrue
statement of a material fact or omit to state a material fact
necessary to make the statements made," and that the statements
and information in the report "fairly present in all material
respects the financial condition, results of operations and cash
flows" of Radian for the relevant time period.  According to the
plaintiff, these statements were false and misleading because the
company had not disclosed that its investment in C-BASS was
impaired and because it did not disclose that the company lacked
adequate internal controls.  Id. ¶¶ 111-16.

On January 24, 2007, Radian filed a Form 8-K with the
SEC that included a press release announcing Radian's financial
results for the fourth quarter and fiscal year of 2006.  For
fiscal year 2006, the company reported a net income of $582.2
million and diluted net income of $7.08 per share.  Ibrahim
commented:

> Radian delivered record net income and grew
> book value by 16.1 percent, despite a
> challenging operating environment . . . .
> This performance demonstrates that our
> strategy to focus on diversification while
> maintaining a strict risk management culture
> continues to deliver long-term value.
>
> . . . .
>
> Forecasts for interest rate stability, strong
> employment and improved persistency bode well
> for the mortgage insurance industry. . . . In

this environment, we believe we are well
positioned to benefit over the long term from
both cyclical and structural opportunities in
the mortgage market.

Id. ¶¶ 118-21.  Further included in Radian's annual report was

the following statement:

As C-BASS participates in the sub-prime
mortgage market as an investor in those
assets, it has been under pressure in early
2007 as spreads on non-investment grade and
non-rated sub-prime mortgage securities have
continued to widen, and the industry has
experienced increased credit losses.  While
this impacts short term results, over the
long term our involvement in these two
companies has delivered a multitude of
benefits to Radian, in the areas of earnings,
franchise value, and diversified and
recurring revenue streams.  Additionally, our
relationships with [C-BASS] and Sherman
provide timely and valuable insights into the
consumer credit marketplace . . . .

Id. ¶ 123.

On March 1, 2007, Radian filed its Form 10-K for the

2006 fiscal year.  This form stated:

As a holder of credit risk, our results are
subject to macroeceonomic conditions and
specific events that impact the credit
performance of the underlying insured assets.
We experienced generally positive results
throughout the business for the year ended
December 31, 2006, led by strong credit
performance and good production despite the
challenging business production environment
for mortgage insurance and financial guaranty
insurance.

. . . .

> For 2006, the financial services segment
> showed another year of strong earnings and
> return on investment, which was, in part, a
> result of the relatively low interest rate
> and favorable credit environment . . . In
> addition, both C-BASS and Sherman were
> positively impacted in the fourth quarter of
> 2006 . . . and C-BASS recovered most of the
> hedge losses that had been incurred in prior
> quarters.
>
> Despite the significant credit spread
> widening that has occurred in the subprime
> mortgage market during the first quarter of
> 2007, which could produce . . . losses for
> C-BASS during the first quarter, we expect
> that both C-BASS's and Sherman's results for
> 2007 will remain fairly consistent with their
> 2006 results, as both companies stand to
> benefit from recurring sources of earnings
> . . . and, while the sub-prime origination
> business is currently uncertain, C-BASS
> typically looks for opportunities to purchase
> mispriced assets in such an environment.

Id. ¶¶ 137-38.

On April 9, 2007, the defendants filed a Form 8-K with the SEC and sent a letter to all Radian shareholders.  A copy of a letter from Ibrahim was included.  This letter stated:

> Our success of 2006 was evident in two
> important respects:  First, in terms of
> financial performance, we achieved or
> exceeded all of our key metrics for the year.
> Second, we continued to focus on and execute
> against a strategy that emphasizes three
> important themes:  diversification,
> discipline and risk management - which in
> turn deliver long-term value to our
> stockholders.

Id. ¶¶ 146-48.

On April 25, 2007, Radian filed with the SEC a Form 8-K announcing its financial results for the first quarter of 2007, ending March 31, 2007.  The company reported net income of $113.5 million and diluted net income per share of $1.42.  Ibrahim commented:

> Our primary book was not significantly
> affected by the disruptions in the subprime
> market in recent months.  I believe this is a
> validation of our long-term approach to risk
> management in all areas, including sub-prime
> and Alt A, where we have remained disciplined
> in diversifying our book of business across
> geographies, products, clients and
> origination years.

With regard to C-BASS, the company stated that "In the financial services segment, net income was $10.8 million, down from . . . the same period last year, primarily as a result of an operating loss at C-BASS."  Id. ¶¶ 149-51.

On April 25, 2007, Radian also held a conference call with analysts and investors.  During the call, the following exchange took place between Quint, Ibrahim, Mark Casale, the president of Radian Guaranty, Inc., a Radian subsidiary, and Bruce Harting, an analyst from Lehman Brothers:

> QUINT: [ . . . At] this point, [C-BASS is]
> comfortable that [it] can resume
> profitability.

> HARTING:  Have they seen real-time signs of
> bids for their securitizations?
>
> CASALE:  Oh, yes.  Remember, Bruce, they
> executed securitizations through that, even
> through the turmoil, which is a testament to
> their name and reputation in the market.  It
> is just when, at the end of the quarter, when
> they had to mark this stuff it was at an
> all-time wide.  Spreads were at an all-time
> wide.
>
> IBRAHIM:  Again, Bruce, as you know, when
> these kind of market conditions occur, while
> everybody gets hurt, the most respected
> players in the market enjoy better executions
> than the others.  The differentiation widens.
> So being the best player in a tough group of
> peers means you get hurt, but you also get
> hurt less.

Id. ¶ 155.

On May 10, 2007, Radian filed its Form 10-Q for the first quarter of 2007.  This form stated:

> As a holder of credit risk, our results are
> subject to macroeconomic conditions and
> specific events that impact the production
> environment and credit performance of our
> underlying insured assets.  We experienced
> mixed results during the first quarter of
> 2007.  Positively, we had strong production
> in both mortgage insurance and financial
> guaranty insurance.  However, mortgage
> insurance losses incurred were higher than
> expected and our financial services segment
> results were negatively impacted by the
> subprime mortgage market disruption which
> significantly affected C-BASS' financial
> performance in the quarter.
>
> . . . .

> For the quarter ended March 31, 2007, the
> financial services segment had mixed results.
> Sherman continued its consistent strong
> earnings; however, C-BASS incurred a loss of
> approximately $15 million as credit losses
> and credit spread widening in the subprime
> mortgage market impacted their results. . . .
> C-BASS is expected to return to profitability
> over the balance of the year, assuming the
> subprime mortgage stabilizes at current
> levels.

Id. ¶ 158.

On June 29, 2007, Radian filed an annual report for the
Plan on Form 11-K with the SEC.  Radian posted the Plan's annual
report on the company's website, together with the company's
other SEC filings and the Plan's annual reports and the
amendments to the Plan.  The form reported that for 2006 the
Plan's assets in the Radian Common Stock Fund were valued at more
than $15.7 million as of December 31, 2006.  Id. ¶¶ 165-68.

On July 24, 2007, Radian filed a Form 8-K with the SEC,
which included a press release announcing the company's financial
results for the second quarter of 2007.  The company represented
that its investment in C-BASS was valued at $467.8 million as of
June 30, 2007.  Ibrahim commented:

> Our second quarter results clearly illustrate
> the credit challenges in today's mortgage
> market, but I believe they also reflect
> long-term positive trends for our business.
> Market conditions, particularly in California
> and Florida, led to an increase in defaults
> that impacts our results.

18

> The company experienced top-line growth,
> improved persistency and renewed demand for
> our traditional mortgage insurance product.
> Our balance sheet remains solid, with a
> highly rated investment portfolio of more
> than $6 billion and total loss reserves of
> more than $900 million . . . in the Financial
> Services segment, net income was $27.3
> million, down from $45.9 million for the same
> period last year.

Id. ¶ 171.  The next day, July 25, 2007, Radian held a conference

call with investors.  During this call, when questioned by an

analyst about C-BASS's liquidity situation, Quint replied:

> [B]ecause they are in a - the sale process
> that we're in right now it's not really
> appropriate to discuss the specific liquidity
> situation.  But I think we should reiterate
> that the whole market is going through a
> tough challenge with regard to liquidity and
> that includes C-BASS.

Id. ¶ 175.  Another analyst asked whether C-BASS was liquidating

some of its assets at depressed values, in particular, certain

bonds.  Quint and Casale replied as follows:

> QUINT:  I don't know where you got that
> information.  I'm not - I don't think that
> was ever spoken about.
>
> CASALE:  And they are not selling any
> bonds . . . .

The questioner further asked whether, "to the extent [C-BASS was]

forced to . . . cover margin cost . . . are they in that position

right now where they are forced to liquidate some of these
positions?"  Casale replied, "No, they are not."  Id.


     E.    <u>Announcement of Impairment and Subsequent Events</u>

       On July 30, 2007, Radian issued a press release
announcing that the value of its investment in C-BASS was
"materially impaired."  The company represented that although it
had not determined the level of the impairment charge it "could
be Radian's entire investment, less any associated tax benefit."
Ibrahim commented:

> While this action clearly reflects the
> continuing credit challenges in today's
> mortgage market, we are moving forward, as
> planned, with our proposed merger with MGIC,
> which we expect to close late in the current
> quarter, or early in the next.

After this announcement, the price of Radian stock declined from
$40.20 per share to $33.71 per share.  Id. ¶¶ 179-82.

       On July 31, 2007, C-BASS issued a press release, which
stated:

> While nothing fundamentally has changed at
> C-BASS, like many other firms in the
> industry, the current severe state of
> disruption in the credit markets has caused
> C-BASS to be subject to an unprecedented
> amount of margin calls from our lenders.  The
> frequency and magnitude of these calls have
> adversely affected our liquidity.  To address
> this, C-BASS is in advanced discussions with
> a number of investors to provide increased

> liquidity and is exploring all options to
> mitigate the liquidity risk in this difficult
> market.
>
> At the beginning of 2007, we had $302 million
> of liquidity, representing greater than 30%
> of our capital of $926 million.  During the
> first 6 months of 2007, a very tumultuous
> time in the subprime mortgage market, C-BASS'
> disciplined liquidity strategy enabled the
> company to meet $290 million in lender margin
> calls.  During the first 24 days of July
> alone, C-BASS met an additional $260 million
> of margin calls, representing greater than a
> 20% decline in the lender's value.  We
> believe that nothing justifies this
> substantial amount of margin calls received
> in such a short period of time, particularly
> as there has been no change in the underlying
> fundamentals of our portfolio.

After this announcement, the price of Radian stock fell from

$33.71 to $27.51 per share.  Id. ¶¶ 194-95.

On August 7, 2007, MGIC issued a press release stating

that, in light of the C-BASS impairment, MGIC was not required to

complete its pending merger with Radian.  According to the press

release, Radian told MGIC that it disagreed with MGIC's

assessment of the merger obligations.  After this announcement,

the price of Radian common stock declined from $23.23 to $20.62

per share.  Id. ¶¶ 196, 198-99.

On September 5, 2007, Radian and MGIC jointly announced

that they had agreed to terminate the pending merger.  According

to the press release they issued, the "current market conditions

have made combining the companies significantly more challenging.

Both MGIC and Radian believe it is in their best interests to remain independent companies at this time."   Id. ¶ 200.

On October 2, 2007, Radian filed a Form 8-K with the SEC, announcing that Deloitte & Touche LLP ("Deloitte"), who had previously served as Radian's independent auditor, declined to stand for reappointment for 2007:

> Deloitte . . . is the independent registered public accountant for Radian Group Inc. (the "Company").  Deloitte's present engagement with the Company had been expected to terminate on or about the filing of the Company's Quarterly Report on Form 10-Q for the third quarter of 2007 (the "Termination Date") had the Company completed its merger with [MGIC].  As previously disclosed, Radian and MGIC mutually terminated their proposed merger on September 5, 2007.  On September 26, 2007, Deloitte declined to stand for reappointment as the Company's independent auditors for the 2007 audit and its engagement will end shortly following the Termination Date.

> . . . .

> During the Company's two most recent fiscal years and the subsequent interim periods preceding September 26, 2007:  (i) there were no "reportable events" . . . and (ii) there was no "disagreement" . . . between the Company and Deloitte on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreement, if not resolved to the satisfaction of Deloitte, would have caused Deloitte to make reference to the subject matter of the disagreement in connection with its report, except as follows:  As previously reported on a Form 10-Q/A dated August 13, 2007 (the "10-Q/A"), on August 9, 2007, the Company filed its

> Quarterly Report on Form 10-Q for the quarter
> ended June 30, 2007 (the "Second Quarter
> 10-Q"), before Deloitte had completed its
> review of the interim financial statements
> included in the Second Quarter 10-Q.  As
> reported in the 10-Q/A, Deloitte needed to
> review additional documentation supporting
> the conclusion that the impairment charge
> relating to the Company's interest in
> [C-BASS] occurred after June 30, 2007.
> Members of the Company's management discussed
> the events surrounding the filing of the
> Second Quarter 10-Q with Deloitte on August
> 9, 2007, and the Chairman of the Company's
> Audit and Risk Committee discussed these
> events with Deloitte on August 10, 2007.  On
> August 14, 2007, the Company filed a second
> amendment to its Second Quarter 10-Q to state
> that the matters related to the impairment
> had been resolved without changes or
> amendments to the interim financial
> statements included in the Second Quarter
> 10-Q.  The Company has authorized Deloitte to
> respond fully to the inquiries of any
> successor accountant concerning this matter
> or any other matter.

Id. ¶ 204.

On November 2, 2007, Radian filed a Form 8-K with the SEC announcing that Radian determined that it would take an impairment charge of $468 million, representing the company's entire investment in C-BASS.  Radian also announced that it could not be certain about the carrying value of a $50 million unsecured credit facility that it had provided to C-BASS.  Id. ¶ 206.

II.  <u>Discussion</u>

The plaintiff claims that various actions by the defendants constitute breaches of fiduciary duties under ERISA. These actions include:  (1) continuing to offer Radian stock as an investment option under the Plan in light of the company's involvement with C-BASS and in the deteriorating subprime mortgage market; (2) providing inaccurate and misleading information to Plan participants regarding the risks associated with Radian stock; (3) taking actions purportedly designed to artificially inflate the value of Radian stock for the benefit of corporate insiders; and (4) failing to monitor the performance of other fiduciaries.

The defendants have moved to dismiss the plaintiff's claims on three grounds:  (1) that the allegations of the complaint as a whole fail to meet the applicable federal pleading standards; (2) that the complaint fails to state a claim for breach of fiduciary duty; and (3) that, at a minimum, the complaint does not state a claim against various defendants who were not Plan fiduciaries within the meaning of ERISA.  The Court concludes that the complaint suffers from pleading deficiencies and fails to state a claim under ERISA.  The complaint shall be dismissed without prejudice.[4]

_____

[4] The Court finds the first two of these arguments sufficient to dismiss the complaint.  The Court will not address the plaintiff's third argument.  However, it will note that

24

A.   <u>Federal Pleading Requirements</u>

Claims for breach of fiduciary duty under ERISA are subject to the pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure.  Rule 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  On a motion to dismiss, the Court will accept the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  <u>See</u> <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009).  Rule 8 does not require "detailed factual allegations," but it demands more than an "unadorned, the-defendant-unlawfully-harmed-me accusation."  <u>Id.</u>; <u>see also</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (explaining that the plaintiff must include factual allegations sufficient to raise a right to relief "above the speculative level").

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face."  <u>Iqbal</u>, 1927 S. Ct. at 1949.  A claim has facial plausibility when the

_____

counsel for the plaintiff stated at oral argument that the plaintiff has "no desire to hold in the wrong people – or pursue wrong people. . . . Again, it's a motion to dismiss.  We don't know the facts. . . . We're just interested in having the right defendants, not anybody extra."  12/19/08 Tr. at 106-07.  The Court will allow the plaintiff thirty days to amend her complaint.  To the extent that she files an amended complaint, however, she should take care to name the proper defendants.

plaintiff pleads sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  Id.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Id.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief."  Id. (internal quotation marks omitted).

The Supreme Court has explained that "two working principles" underlie a motion to dismiss inquiry.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  Id. at 1950.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  Id.  Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but has not "shown," that the pleader is entitled to relief within the meaning of Rule 8(a)(2).

26

Although Rule 8's pleading requirements apply generally to ERISA claims for breach of fiduciary duty, as other courts in this circuit have noted, to the extent that any claims sound in fraud, they are subjected to the heightened pleading requirements of Rule 9(b).  See Urban v. Comcast, No. 08-773, 2008 WL 4739519, at *9 (E.D. Pa. Oct. 28, 2008); Pietrangelo v. NUI Corp., No. 04-3223, 2005 WL 1703200, at *9 (D.N.J. July 20, 2005); In re Ikon Office Solutions, Inc. Sec. Litig., 86 F. Supp. 2d 481, 488 (E.D. Pa. 2000); accord Caputo v. Pfizer, Inc., 267 F.3d 181, 191 (2d Cir. 2001).  Rule 9(b) requires a party alleging fraud or mistake to allege with particularity the circumstances constituting fraud or mistake.  Fed. R. Civ. P. 9(b).  Under this rule, the circumstances of the alleged fraud must be pled with sufficient particularity to place the defendant on notice of the "precise misconduct" with which it is charged.  Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007) (quoting Lum v. Bank of Am., 361 F.3d 217, 223-24 (3d Cir. 2004)).

Insofar as the plaintiff alleges that the defendants knew or recklessly ignored certain facts, such factual allegations would ordinarily be subjected to the heightened pleading standards of Rule 9(b).  E.g., Compl. ¶¶ 105-06, 288, 290-91.  However, in her opposition to the defendants' motion to dismiss, and at oral argument, the plaintiff specifically disavowed that she is alleging anything more than negligence and

27

imprudent breach of fiduciary duty on the part of the defendants. Pl.'s Opp. 15; 12/19/09 Tr. at 101, 106.

As the Court will explain, even under Rule 8, the plaintiff's breach of fiduciary duty claims do not survive.

B.   <u>Failure to State a Claim for Breach of Fiduciary Duty</u>

The plaintiff asserts that the defendants have violated various fiduciary duties owed to the Plan.  She claims that the defendants have violated their duties to prudently manage plan assets, to provide Plan participants with all material information regarding the risks associated with investment in Radian stock, to act solely in the interests of Plan participants, and to monitor the performance of other fiduciaries.  The defendants argue that the plaintiff fails to state a claim for relief.  The Court agrees, and will grant the defendants' motion.

1.   <u>Duty of Prudence</u>

According to the plaintiff, the defendants violated their fiduciary duty to prudently manage plan assets both by investing employer matching contributions in Radian stock and by continuing to offer Radian stock as a plan investment option for participants in light of Radian's impaired investment in C-BASS and the deteriorating conditions of the subprime mortgage market.

28

Her claim is based on the theory that the defendants should have known that the price of Radian stock was artificially inflated as a result of the alleged misstatements and omissions regarding Radian's investment in C-BASS.

The defendants argue that the plaintiff's prudence claim should be dismissed because it does not meet the standards articulated in Moench v. Robertson, 62 F.3d 553 (3d Cir. 1995), and Edgar v. Avaya, 503 F.3d 340 (3d Cir. 2007). Second, they argue that Plan participants' control over their investments relieves Plan fiduciaries of their fiduciary responsibilities under ERISA § 404(c). Because the Court finds that the plaintiff has not met her burden of establishing a breach of the duty of prudence under Moench, her prudence claim will be dismissed.[5]

ERISA § 404 establishes a "prudent man" standard of care to govern the actions of plan fiduciaries. 29 U.S.C. § 1104(a). Plan fiduciaries must discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Id. § 1104(a)(1)(B). The duty of prudence requires a plan fiduciary to diversify the investments of the plan so as to minimize the

---

[5] Because the Court finds that the plaintiff has not carried her burden under Moench, it need not address the parties' arguments regarding § 404(c).

29

risk of large losses, "unless under the circumstances it is
clearly prudent not to do so."  Id. § 1104(a)(1)(C).  Fiduciaries
must also act "in accordance with the documents and instruments
governing the plan" insofar as those documents and instruments
are consistent with ERISA.  Id. § 1104(a)(1)(D).

A court's task in evaluating a fiduciary's compliance
with the duty of prudence is to inquire whether a fiduciary
employed the appropriate methods to investigate and determine the
merits of a particular investment.  The prudence requirement is
thus an objective standard, focusing on a fiduciary's conduct in
arriving at an investment decision, and not on the results of
that decision.  In re Unisys Sav. Plan Litig., 74 F.3d 420, 434
(3d Cir. 1996); see also Kirschbaum v. Reliant Energy, Inc., 526
F.3d 243, 253 (5th Cir. 2008) (stating that the focus of the
prudence inquiry is "how the fiduciary acted," and not "whether
his investments succeeded or failed" (quoting Donovan v.
Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983)).

The prudence requirement is also a flexible standard,
and a fiduciary's conduct is to be evaluated in light of the
character and aims of the particular type of plan he serves.  In
re Unisys, 74 F.3d at 434 (quoting Donovan, 716 F.2d at 1467);
see also Varity Corp. v. Howe, 516 U.S. 489, 497 (1996) (stating
that courts must interpret the prudence requirement in a manner

30

consistent with "the special nature and purpose of employee benefit plans").

In Moench v. Robertson, the United States Court of Appeals for the Third Circuit acknowledged that ERISA contains specific provisions governing plans that are designed to invest in employer securities.[6]  Such plans, unlike pension plans, are not intended to guarantee retirement benefits.  Rather, by their very nature, these plans place employee retirement assets at much greater risk than do the typical diversified ERISA plans. Moench, 62 F.3d at 568 (quoting Martin v. Feilen, 965 F.2d 660, 664 (8th Cir. 1992)).  As the Moench court explained, Congress has repeatedly expressed its intent to encourage the formation of such plans by passing legislation granting them favorable treatment.  Id. at 569; see also Fink v. Nat'l Sav. & Trust Co., 772 F.2d 951, 956 (D.C. Cir. 1985) (noting the "strong policy and preference in favor of investment in employer stock").

For example, EIAPs are exempt from ERISA's diversification requirement and its prudence requirement to the extent that it requires diversification.  29 U.S.C. § 1104(a)(2). EIAPs are also exempt from the percentage limitation on

---

[6] Although Moench dealt specifically with the prudence requirement for fiduciaries of ESOPs, the Court of Appeals has since clarified that the standard and principles articulated in Moench also govern judicial review of the actions of EIAP fiduciaries more generally.  See Edgar v. Avaya, 503 F.3d 340, 347-48 (3d Cir. 2007).

investments in an employer's securities.  Id. § 1107(b)(1).
Acquisition of employer securities by an EIAP also does not, in
and of itself, violate ERISA's prohibition against transactions
between a plan and a "party in interest."  See id. § 1108(e); see
also infra Section II.B.3.

Despite these exemptions, however, ERISA's prudence
requirement continues to apply to an EIAP's fiduciaries.  See
Edgar, 503 F.3d at 346; Moench, 62 F.3d at 569.  In Moench, the
Court of Appeals adopted a prudence standard that attempted to
strike the proper balance between encouraging investment in
employer stock and enforcing ERISA's standards of fiduciary
responsibility.  The Moench court was unwilling to subject EIAP
fiduciaries to the "strict scrutiny" that applies under
conventional trust law to a trustee who is simply authorized,
rather than required, to make a particular investment.  Doing so,
it noted, would eviscerate the statutory preference for employee
stock ownership plans.  Moench, 62 F.3d at 570.  At the same
time, however, the court declined to adopt a per se rule that the
decision of an ESOP or EIAP fiduciary to invest in employer
securities is not subject to judicial review.  Edgar, 503 F.3d at
346; Moench, 62 F.3d at 571.

To strike the proper balance, the Moench court held
that an ESOP fiduciary who invests plan assets in employer stock
is entitled to a presumption in the first instance that it acted

consistently with ERISA.  See Moench, 62 F.3d at 571.  A

plaintiff may rebut the presumption by establishing that the

fiduciary abused its discretion by investing in employer

securities.  To do so, the plaintiff may introduce evidence that

"owing to circumstances not known to the settlor and not

anticipated by him [the making of such investment] would defeat

or substantially impair the accomplishment of the purposes of the

trust."  Id. (quoting Restatement (Second) of Trusts § 227

cmt.g).

        In applying the Moench presumption of prudence, courts

must "be cognizant that as the financial state of the company

deteriorates . . . fiduciaries who double as directors of the

corporation often begin to serve two masters.  And the more

uncertain the loyalties of the fiduciary, the less discretion it

has to act."  Id. at 572.  However, courts must also be aware of

the fact that if the fiduciary, in what it regards as an exercise

of caution, does not maintain the investment in the employer's

securities, it may face liability for that caution, particularly

if the employer's securities thrive.  Id. at 571-72.

        In Edgar, the Court of Appeals reinforced the standard

for rebutting the presumption that the fiduciary acted prudently

in investing in employer securities - that a plaintiff must show

that the ERISA fiduciary "could not have believed reasonably that

continued adherence to the [plan's] direction was in keeping with

the settlor's expectations of how a prudent trustee would operate." Id. (quoting Moench, 62 F.3d at 571).  To meet this standard on the pleadings, the facts alleged should depict the kind of "dire situation" that would require plan fiduciaries to disobey plan terms to invest in company stock in order to satisfy their prudent investment obligation to plan participants under ERISA.  Id.  Such facts might include, as was the case in Moench, a "precipitous decline" in the price of the employer's stock, together with allegations that plan fiduciaries knew of the stock's "impending collapse" and the fiduciaries' own internal conflicts over the proper course of action for the ESOP.  Id. at 348; see also Moench, 62 F.3d at 572.  The Edgar court further explained that, while Moench did not require a company "to be on the brink of bankruptcy before a fiduciary is required to divest a plan of employer securities," the "bare allegations of fraud and other wrongdoing" set forth in the plaintiff's complaint in that case were insufficient to establish an abuse of discretion. Id. at 349 n.13.

        Taken together, Moench and Edgar stand for the proposition that short-term financial difficulties do not create a duty to halt or modify investments in an otherwise lawful ERISA fund that consists primarily of employer securities.  See Wright v. Ore. Metallurgical Corp., 360 F.3d 1090, 1099 (9th Cir. 2004) ("Mere stock fluctuations, even those that trend downward

34

significantly, are insufficient to establish the requisite
imprudence to rebut the <u>Moench</u> presumption. . . . The <u>Moench</u>
standard . . . merely requires fiduciaries to act reasonably.  It
does not require them to act in an extraordinarily prescient
manner.").  Plan fiduciaries do not have a duty to depart from
ESOP or EIAP plan provisions whenever they are aware of
circumstances that may impair the value of company stock.  Nor
can a plaintiff overcome the <u>Moench</u> presumption merely by
alleging that a prudent fiduciary would have made a different
investment decision.  Other federal courts applying the <u>Moench</u>
presumption have thus stated that there should be "persuasive and
analytically rigorous facts demonstrating that reasonable
fiduciaries would have considered themselves bound to divest."
<u>Kirschbaum</u>, 526 F.3d at 256; <u>see also</u> <u>id.</u> ("Less than rigorous
application of the Moench presumption threatens its essential
purpose."); <u>Morrison v. Moneygram Intern., Inc.</u>, No. 08-1121,
2009 WL 803479, at *14 (D. Minn. Mar. 25, 2009); <u>Halaris v.
Viacom, Inc.</u>, No. 06-1646, 2008 WL 3855044, at *2 (N.D. Tex. Aug.
19, 2008); <u>In re Dell, Inc. ERISA Litig.</u>, 563 F. Supp. 2d 681,
693 (W.D. Tex. 2008).

          The defendants argue that, under <u>Moench</u>, where the
plan at issue "absolutely requires" investment in employer stock,
there is no investment that is subject to judicial review for
abuse of discretion under <u>Moench</u>.  They argue that the Radian

Plan affords no discretion to halt investment in Radian stock. See Defs.' Mot. at 27 (citing <u>Moench</u>, 62 F.3d at 571); <u>see also</u> 12/19/08 Tr. at 73-74.  Although the <u>Moench</u> court indicated that there might be a separate standard of review where a plan in "absolutely unmistakable terms requires that the fiduciary invest the assets in the employer's securities regardless of the surrounding circumstances," it did not reach such a holding.  <u>Id.</u> at 567 n.4.[7]

At this stage, the Court need not resolve whether there is a separate, more deferential standard of review for plans that absolutely require investment in employer stock.  The Court concludes that the generalized allegations of wrongdoing contained in the complaint are insufficient to rebut <u>Moench</u>'s abuse of discretion standard.  The plaintiff therefore cannot meet any more deferential standard that might be appropriate where an EIAP absolutely requires investment in employer stock. See <u>Kirschbaum</u>, 526 F.3d at 255-56.

Here, the plaintiff alleges that the defendants continued to invest Plan assets and to allow participant

---

[7] The <u>Moench</u> court noted that it was not concerned with such a case, and, accordingly, clarified that its decision "should not be understood as suggesting that there never could be a breach of fiduciary duty in such a case."  <u>Id.</u> at 567 n.4; <u>see also</u> <u>Edgar</u>, 503 F.3d at 346 n.10.  It also did not reach the plaintiff's argument that even if the plan directed the committee to invest solely in company stock, ERISA nevertheless required the committee to ignore the plan terms when those terms conflicted with its fiduciary obligations under ERISA.  <u>Id.</u>

investment in Radian stock.  The defendants are entitled to a presumption in the first instance that they acted consistently with ERISA by virtue of those decisions.  The question for the Court is whether the allegations of the complaint are sufficient to rebut that presumption, in that the defendants could not have believed reasonably that continued adherence to the Plan's directions was in keeping with the settlor's expectations of how a prudent trustee would operate.

The plaintiff has made clear that she does not intend to argue that the defendants knew that investing in Radian stock was imprudent because they knew of the C-BASS impairment.  Her argument, then, is that the defendants should have known that Radian's investment in C-BASS was impaired, and that their failure to investigate the prudence of continued investment in Radian stock was negligent or imprudent.

As a preliminary matter, the Court is not persuaded that the plaintiff has alleged sufficient facts to show that C-BASS was facing a "monumental liquidity crisis."  Although the plaintiff states that C-BASS received margin calls from lenders throughout the class period, and that the value of the risky subprime assets held by C-BASS had declined, she does not allege that C-BASS was unable to meet margin calls from lenders in the regular course of business.  To the contrary, the complaint acknowledges, without disputing or contradicting, C-BASS's public

37

statement that during the first six months of 2007, a "disciplined liquidity strategy" enabled it to meet $290 million in lender margin calls, and that during the first twenty-four days of July alone, C-BASS met an additional $260 million of margin calls.  Compl. ¶ 194.

That C-BASS was receiving margin calls does not, in and of itself, establish that C-BASS was facing a monumental liquidity crisis, especially where C-BASS was able to meet and pay these calls as they were received.  To the extent that no such crisis existed, it is not the case that the Radian Plan fiduciaries should have known of such a crisis, such that their actions throughout the class period were imprudent.

On the other hand, even if the allegations of the complaint might show a "monumental" liquidity crisis at C-BASS, they do not establish a breach of the duty of prudence.  The allegations do not show that even if a liquidity crisis existed at C-BASS, Radian's ongoing viability as a company was implicated and Plan fiduciaries should have halted or otherwise reconsidered the prudence of investment in Radian's common stock, even in the face of Plan instructions to the contrary.

Although the plaintiff is not required to show that Radian itself was on "the brink of bankruptcy" before Plan fiduciaries would have been required to divest the Plan of Radian securities, the bare allegations of wrongdoing in the complaint

do not show an abuse of discretion.  At most, the plaintiff's allegations, if true, indicate that during the class period, C-BASS may have experienced certain developments that had a negative effect on its earnings, and, by extension, the value of Radian's investment in C-BASS.  See Edgar, 503 F.3d at 348.

The plaintiff does not allege that Plan fiduciaries did not properly follow the Plan's directions by investing in Radian stock, or that the value of Radian's entire portfolio of investments was impaired to the extent that Radian itself was faced with the kind of dire situation in which Plan fiduciaries should have known that Radian stock would no longer be a prudent investment, or even that a prudent fiduciary with knowledge of the C-BASS impairment could not have reasonably believed that continuing to invest in Radian stock was within the settlor's expectations of how the fiduciaries should operate.

Although the plaintiff alleges, generally, that Radian's lenders began to require it to put up more collateral, the complaint contains no information about the value of Radian's other investments.  It does not discuss the value of the investments of Radian's mortgage insurance and financial guaranty sectors.  It also does not, within the financial services sector, discuss the value of Radian's investment in Sherman.  The complaint does not allege that C-BASS was Radian's primary or

only investment; nor does it allege what portion of Radian's business C-BASS constituted.

The plaintiff's prudence claim, rather, amounts to a claim that because of an impairment of Radian's investment in C-BASS, a prudent fiduciary would have considered whether to shut down the Radian Plan altogether, or, at least, to discontinue the Plan as an EIAP.  The Court agrees with the defendants that such actions are not within the scope of an ERISA fiduciary's responsibilities.  See Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 444 (1999).  Moreover, Moench and Edgar do not require fiduciaries to depart from ESOP or EIAP plan provisions whenever they are merely aware of circumstances that may impair the value of company stock.  Thus, even to the extent that the complaint alleges a downward trend in the value of Radian stock that may coincide with the alleged impairment of Radian's investment in C-BASS, this downward trend is not sufficient to establish that the defendants abused their discretion under Moench.  See Wright, 360 F.3d at 1099.

A court's task in evaluating a fiduciary's compliance with the duty of prudence is to inquire whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment.  In conducting that inquiry, the Court is required to consider the nature of the plans at issue.  Even to the extent that the plaintiff has adequately

40

alleged a liquidity crisis at C-BASS, the Court cannot say that the defendants acted negligently or imprudently in failing to investigate the whether Radian stock remained a prudent investment, especially in light of the fact that the Radian Plan was an EIAP.  A primary purpose of such a plan is to encourage investment in employer securities.  By its very nature, the Plan placed employee retirement assets at much greater risk than do the typical diversified ERISA plans.  <u>See</u> <u>Edgar</u>, 503 F.3d at 347; <u>Moench</u>, 62 F.3d at 568.[8]

The allegations of the complaint do not establish an abuse of discretion to rebut the <u>Moench</u> presumption.  Although the complaint pleads facts that may be consistent with liability on the part of those defendants properly considered Plan fiduciaries, the Court concludes that it stops short of the line between possibility and plausibility of entitlement to relief. The plaintiff's prudence claim will therefore be dismissed.[9]

---

[8] Indeed, the Radian Plan stated that "it is much more difficult to anticipate the risk characteristics of [the Radian Stock Fund] versus the diversified fund options available under the Plan."  Defs.' Mot. Ex. 2 at 7.

[9] Although the plaintiff alleges other acts that a "prudent" trustee might have taken, the plaintiff cannot overcome the <u>Moench</u> presumption merely by alleging that a prudent fiduciary would have made a different investment decision.  Even so, such allegations amount to legal conclusions, which, under <u>Iqbal</u>, the Court need not credit in deciding whether the plaintiff has sufficiently rebutted the <u>Moench</u> presumption.

2.   <u>Duty of Disclosure</u>

The plaintiff argues that the defendants breached their fiduciary duty of disclosure by failing to provide Plan participants with all material information regarding the value of and the risks associated with investment in the Radian Stock Fund.  She argues that Plan documents incorporated by reference the aforementioned allegedly false and misleading statements and SEC filings.  She claims that these statements and filings failed to disclose the impairment of Radian's investment in C-BASS, and instead fostered a positive attitude toward investment in Radian stock, even as the value of Radian's investment in C-BASS declined.  According to the plaintiff, the defendants' statements and omissions caused the Plan and its participants to hold and maintain Plan investments in Radian stock instead of in other, alternative investment options.  The plaintiff argues that, had Radian's impairment been announced at an earlier date, the decrease in the value of participants' vested Plan holdings would have been less substantial.

ERISA requires plan fiduciaries to inform plan participants of facts material to their investments and forbids fiduciaries from making material misrepresentations about the risks of a fund investment.  <u>Edgar</u>, 503 F.3d at 350; <u>In re Unisys</u>, 74 F.3d at 440-42.  This duty encompasses not only a negative duty not to misinform, but also an affirmative duty to

42

inform when the fiduciary knows that silence might be harmful. Edgar, 503 F.3d at 350.  In the investment context, a misrepresentation is material if there was "a substantial likelihood that it would have misled a reasonable participant in making an adequately informed decision about whether to place or maintain monies in a particular fund."  Id.

        As a preliminary matter, the defendants contend that the statements identified as misleading in the complaint - SEC filings, press releases, and statements to market analysts - were made to the general public in the ordinary course of business by Radian in its corporate capacity.  Such public statements, they argue, cannot give rise to ERISA liability as a matter of law because they are not fiduciary communications.  The plaintiff, on the other hand, argues that such statements became fiduciary communications by virtue of their incorporation by reference into Plan documents.

        Even if such communications are Plan fiduciary communications, they are insufficient to establish a breach of the duty of disclosure in this case.  First, as the Court has explained, the plaintiff has not adequately alleged a monumental liquidity crisis at C-BASS, such that the defendants responsible for the allegedly misleading statements should have been aware - or actually knew - that their statements were misleading.

Second, the allegedly misleading statements themselves advised investors of the market risks presented by the company's involvement in the subprime market.  Even if these statements did not fully disclose all margin calls at C-BASS, the statements did advise participants of losses at C-BASS.  The Plan documents also explicitly advised participants that the Radian stock fund was non-diversified and that maintaining a diversified and balanced portfolio was key to retirement security.  These disclosures, taken together, fulfill the duty of disclosure under Edgar.

In Edgar, the plaintiff claimed that plan fiduciaries should have disclosed certain information regarding the value of Avaya stock to plan participants or the market at large at some point prior to the employer's quarterly earnings report.  503 F.3d at 350-51.  The United States Court of Appeals for the Third Circuit held that the defendants fulfilled their duty of disclosure by informing plan participants about the potential risks associated with investment in the Avaya stock funds:

> [Avaya's] Summary Plan Descriptions inform Plan
> participants that their investments are tied to the
> market performance of the funds; that each fund carries
> different risks and potential returns; that
> participants are responsible for investigating these
> investment options; and that, in doing so, they might
> consider seeking the advice of a personal financial
> advisor.  In addition, the Plan descriptions explicitly
> warn participants that there are particular risks
> associated with investing in a non-diversified fund.
> Nowhere in the Plan Descriptions or the plans
> themselves are participants guaranteed a particular
> return on their investments.

44

Id. at 350.  The Court of Appeals concluded that these disclosures were sufficient, at the motion to dismiss stage, to satisfy the defendants' obligation not to misinform participants about the risks associated with investment in the Avaya stock fund.  Id.  The defendants had no further duty to "give investment advice" or "to opine on" the stock's condition; instead, the information that the Plan participants had received "provided them the opportunity to make their own informed investment choices."  Id.  That the defendants did not inform Plan participants about "several adverse corporate developments" prior to the allegedly misleading announcements at issue did not on its own give rise to a breach of the duty of disclosure.  Id. at 350-51.

        Under Edgar, the defendants' disclosures to Radian Plan participants fulfill their disclosure responsibilities.  The Radian SPD informs Plan participants that their investments are tied to the market performance of the funds.  Defs.' Mot. Ex. 6 at 7.  It also explains that each fund carries different risks and potential returns.  Id.  Plan participants were further informed that they were responsible for investigating these

45

investment options, and that they could request information concerning the value of any investment or asset.  Id.[10]

The SPD also explicitly warns participants that there are particular risks associated with investing in a non-diversified fund such as the Radian Stock Fund.  See Defs.' Mot. Ex. 6 at 27; see also Defs.' Mot. Ex. 9 at 4.  Finally, as in Edgar, nowhere in the SPD or the Plan itself are participants guaranteed a particular return on their investments.

Under Edgar, these disclosures fulfill the duty not to misinform participants about the risks associated with investment in the Radian stock fund.  The defendants had no duty to further opine on the condition of Radian common stock, nor to reveal further information about C-BASS.  Even if they did have such a duty, the complaint itself establishes that Radian publicly informed the market, and Plan participants, of the state of the subprime market and the potential effects on Radian's investment in C-BASS throughout the class period.

For example, in Radian's March 1, 2007, Form 10-K, the company acknowledged that "[a]s a holder of credit risk, our results are subject to macroeconomic conditions and specific events that impact the credit performance of the underlying

---

[10] In a "Guide to Retirement Benefits" given to Plan participants, they were also told that they might consider seeking the advice of a personal financial advisor.  See Defs.' Mot. Ex. 8 at 7.

insured assets.  We experienced generally positive results throughout the business year ended December 31, 2006 . . . ." That document further identified "the challenging business production environment for mortgage insurance and financial guaranty insurance," and "the significant credit spread widening that has occurred in the subprime mortgage market during the first quarter of 2007, which could produce . . . losses for C-BASS during the first quarter."  Compl. ¶¶ 137-38.

Moreover, in its April 25, 2007, Form 8-K, Radian further identified the "disruptions in the subprime market in recent months," and stated that income was down from the previous year in the financial services segment "primarily as a result of an operating loss at C-BASS."  Id. ¶¶ 149-51.  On the conference call held that day, Radian also stated that "when these kinds of conditions occur, . . . everybody gets hurt."  Id. ¶ 155.

In addition, in its May 10, 2007, Form 10-Q, Radian disclosed that in the second quarter of 2007, "results were negatively impacted by the subprime mortgage market disruption which significantly affected C-BASS' financial performance in the quarter."  Radian also revealed that "C-BASS incurred a loss of approximately $15 million as credit losses and credit spread widening in the subprime mortgage market impacted their results." Id. ¶ 158.

These disclosures, taken together, paint a picture of Radian as a company that experienced strong results in 2006, and which began to experience some losses in its overall portfolio in early 2007 as a result of disclosed losses at C-BASS - which Radian admitted were higher than expected.  However, even despite these losses, there is no basis to conclude, on the pleadings, that either these losses or the overall disruptions in the subprime market significantly affected Radian's "primary book" or that Radian's "balance sheet" did not remain "solid."  Taken together with the disclosures in the Plan documents received by participants, the disclosures in Radian's public filings provided Plan participants the opportunity to make their own informed investment choices.

The plaintiff argues that Edgar does not govern her disclosure claim because the theory underlying the claim differs from that of the claim in Edgar.  In Edgar, the plaintiff argues, the court's rejection of the plaintiff's disclosure claim was based on a failure to prove loss causation.  See Urban, 2008 WL 4739519, at *14.[11]  That is, in Edgar, the wrongdoing underlying

---

[11] In concluding that the plaintiff in Edgar did not state a disclosure claim, the Court of Appeals took note of the "efficient capital markets hypothesis."  That is, because publicly disclosed adverse information often results in swift market adjustments, stockholders could not have sold their stock at the higher, pre-announcement price in any event.  Moreover, even had plan administrators decided to divest the Plans of company stock based on information that was not publicly available, they could have faced potential liability under the

  
the plaintiff's disclosure claim was a failure to inform plan
participants of adverse corporate developments, such as lower
sales and higher costs, which affected company earnings.

On the other hand, the plaintiff argues that the claim
here is that the allegedly false and misleading statements
artificially inflated the price of Radian stock, thus preventing
the market from properly valuing Radian stock, and further
preventing Plan participants from acting simultaneously on the
information.  The plaintiff explains that she is not arguing that
Plan participants were entitled to the higher, pre-announcement
price, but rather, that any post-announcement price would have
been higher had Radian disclosed the impairment of its investment
in C-BASS at an earlier time.

At least one case from this circuit has distinguished
between disclosure claims that fail due to a failure to allege
loss causation and those asserting that affirmative
representations artificially inflated the value of company stock.
See In re Merck & Co., Inc. Sec., Deriv., & "ERISA" Litig., MDL
No. 1658, 2009 WL 790452, at *5 (D.N.J. Mar. 23, 2009).  In
Merck, the plaintiffs alleged that the defendant actively
disseminated knowingly false information through SEC filings,
press releases, and public marketing about Vioxx, "a top-selling
product that was key to the company's success."  Id.  The

securities laws for insider trading.  Edgar, 503 F.3d at 350.

complaint charged that Merck's affirmative misrepresentations about the safety profile of Vioxx were intended to keep sales high, which in turn overstated the strength of the company, boosted its market value, and "fostered an inaccurately rosy picture of the soundness of the Fund[s] or Merck stock as a Plan investment." Id.

        The Merck court reasoned that an ERISA claim involving allegedly deliberate efforts to mislead investors is not subject to the same lack-of-loss-causation defect inherent in a "pure non-disclosure claim." Id. In the former situation, the court explained, the market's assimilation of the previously withheld information and the plan participant's ability to act on the information would be simultaneous, and the loss allegedly incurred by the plaintiffs in purchasing overvalued Merck stock could have been avoided had the alleged misrepresentations not been made at all. In the latter situation, the failure to comply with the ERISA communications duty prevents the stock price from making the appropriate downward adjustment. Because of the assumption that information would be swiftly assimilated by the market, the loss is the same whether or not the disclosure is made. In contrast, the court explained, by alleging that the defendants' misrepresentations artificially raised the price of company stock, the plaintiffs alleged loss causation. Id. at *5.

Even if <u>Edgar</u> is not dispositive of the plaintiff's disclosure claim, the Court is not persuaded that she has otherwise stated a disclosure claim.  First, as a preliminary matter, the Court has found that the plaintiff has not adequately alleged an impairment of Radian's investment in C-BASS; she therefore has not adequately supported her claim of "artificial inflation."  Second, in the <u>Merck</u> case, the plaintiffs alleged that Merck "actively disseminated knowingly false information." The case thus involved "allegedly deliberate efforts to mislead investors."  <u>Id.</u>  Here, the plaintiff has specifically disavowed that the defendants acted deliberately or fraudulently.  This distinction is significant.  To the extent that the plaintiff alleges only that the defendants' disclosures were negligent or imprudent, her claim becomes a mere variation of her prudence claim.  For the reasons stated, that claim does not withstand Rule 12(b)(6) scrutiny.

Under either theory of liability for breach of the duty of disclosure, the plaintiff fails to state a claim.  Her disclosure claim is therefore dismissed.

51

3.   Duty of Loyalty - Conflict of Interest and
     Prohibited Transactions

The plaintiff argues that the defendants breached their
fiduciary duty to loyally manage Plan assets.  She claims that
the defendants had a personal stake in seeing the proposed merger
succeed, and that they placed Radian's interests and their own
interests above the interests of the Plan and its participants
with respect to the investments of the Plan in Radian stock.  She
also claims that the defendants might have taken several actions,
including the engagement of an independent fiduciary, in order to
avoid any conflict-of-interest problems.  Instead, she argues,
the defendants took actions to artificially inflate Radian stock,
including the continued investment of Plan assets in the Radian
Stock Fund, and the withholding of information regarding the true
value of Radian's investment in C-BASS.  In doing so, not only
did the defendants violate their duty of loyalty, but they also
engaged in prohibited transactions under 29 U.S.C. § 1106.


         a.   Conflict of Interest

ERISA does not prohibit fiduciaries from having
interests adverse to those of plan participants.  Pegram v.
Herdich, 530 U.S. 211, 225 (2000).  Rather, the fact that a
fiduciary's interests were adverse to those of plan participants
may be relevant in determining whether the fiduciary acted
prudently under the circumstances.  See Moench, 62 F.3d at 572

52

("[T]he more uncertain the loyalties of the fiduciary, the less discretion it has to act.").

Thus, the mere fact that a fiduciary has an adverse interest, or that a fiduciary's action incidentally benefits an employer, does not show that a fiduciary has breached the duty of loyalty. Trenton v. Scott Paper Co., 832 F.2d 806, 809 (3d Cir. 1987); see also DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 421 (4th Cir. 2007). Rather, ERISA plan fiduciaries violate the duty of loyalty when they actually act in the interests of the plan sponsor or of themselves rather than for the sole benefit of the participants and beneficiaries of the Plan. Reich v. Compton, 57 F.3d 270, 291 (3d Cir. 1995); see also 29 U.S.C. § 1104(a)(1) (stating that fiduciaries must act with the "exclusive purpose" of providing benefits to plan participants).

The plaintiff contends that the defendants breached their duty of loyalty in this case because they did not act with "single-minded devotion" to the Plan participants and that they placed their own interests above the interests of the Plan with respect to investment in Radian stock. She further claims that the defendants should have engaged independent fiduciaries who could have made independent judgments concerning the Plan's investment in Radian stock.

The defendants argue that the complaint's conflict-of-interest allegations are insufficient as a matter of law. That

53

certain Radian executives supposedly had a personal stake in
seeing a proposed merger succeed does not, they argue, in and of
itself constitute a conflict of interest or a breach of the duty
of loyalty.  Moreover, the defendants argue that the complaint
fails to allege that any purported conflict caused Plan
fiduciaries to take any improper actions as fiduciaries.

Again, as a preliminary matter, the plaintiff has not
sufficiently alleged an earlier "impairment" of Radian's
investment in C-BASS.  In such a case, no conflict of interest
would exist in the first instance.  Second, to the extent that
the plaintiff concedes that she intended only to plead
negligence, rather than deliberate or reckless misconduct, that
concession conflicts with an argument that any defendant acted
with a purpose other than the interest of Plan participants and
beneficiaries.  Even so, as the Court has explained, the mere
fact that a fiduciary may have had interests adverse to those of
plan participants does not alone state a claim for breach of
fiduciary duty under ERISA.  For these reasons, the plaintiff's
allegations regarding Ibrahim's or Croner's interests in seeing
the Radian/MGIC merger succeed are insufficient to sustain the
plaintiff's duty of loyalty claim.[12]

---

[12] For these reasons, the Court also does not find that the
conflict-of-interest allegations in this case are sufficient to
support an inference that the relevant defendants abused their
discretion in permitting investment in Radian stock.

b.   <u>Prohibited Transactions</u>

Section 406 of ERISA lists certain "prohibited transactions" in which the plan may not engage, including (a) certain transactions between the plan and "a party in interest," (b) certain transactions between the plan and a fiduciary, or (c) certain transfers of real property to the plan by a party in interest.  <u>See</u> 29 U.S.C. § 1106.  Under § 408, however, § 406 does not apply to the acquisition by a plan of qualifying employer securities if such acquisition is for adequate consideration, if no commission is charged, and if the plan is an EIAP.  <u>See</u> <u>id.</u> § 1108(e).  "Adequate consideration" is defined by 29 U.S.C.A. § 1002(18) as follows:

> (A)   in the case of a security for which there is a generally recognized market, either (i) the price of the security prevailing on a national securities exchange . . . , or (ii) if the security is not traded on such a national securities exchange, a price not less favorable to the plan than the offering price for the security as established by the current bid and asked prices quoted by persons independent of the issuer and of any party in interest; and

> (B)   in the case of an asset other than a security for which there is a generally recognized market, the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan . . . .

The plaintiff argues that § 408's exemption does
not apply in this case because the securities were purchased
at artificially inflated prices, rather than for adequate
consideration.  See Compl. ¶ 300.  One district court did
accept such a theory because it "place[d] Defendants on
notice of the claims being asserted."  In re Sears, Roebuck &
Co. ERISA Litig., No. 02-8324, 2004 WL 407007, at *9 (N.D.
Ill. Mar. 3, 2004).  Other courts to address the issue,
however, simply construe the plain language of the statute,
which defines "adequate consideration" without mention of any
good faith requirement with regard to registered securities
for which there is a generally recognized market.[13]  These
courts acknowledge that "because 406(a) characterizes per se
violations, it should be interpreted narrowly."  Pietrangelo,
2005 WL 1703200, at *13 (citing Jordan v. Mich. Conference of
Teamsters Welfare Fund, 207 F.3d 854, 858 (6th Cir. 2000)).

In In re CMS Energy ERISA Litig., 312 F. Supp. 2d
898, 917 (E.D. Mich. 2004), the district court specifically
rejected the argument that § 408's exemption does not apply
where securities were allegedly purchased at artificially
inflated prices because it was undisputed that the shares

_____

[13] 29 U.S.C. § 1002(18)(B), which applies to assets other
than securities, does require good-faith valuation of the assets.
Section 1002(18)(A), on the other hand, contains no such
requirement.

56

were acquired at market price on the New York Stock Exchange. The plaintiffs there cited no legal authority to persuade the court to depart from the statutory definition of adequate consideration, reasoning that "[a]s in any case of statutory construction, our analysis begins with the language of the statute . . . And where the statutory language provides a clear answer, it ends there as well." Id. (quoting Harris Trust & Sav. Bank v. Salomon Smith Barney, 530 U.S. 238, 254 (2000)). Because there was no dispute as to whether a price other than that set by the New York Stock Exchange was paid for shares of CMS stock during the relevant time periods the court dismissed the prohibit transactions claim. See also Pietrangelo, 2005 WL 1703200, at *13.

The Court finds persuasive the plain-language reasoning adopted by the courts in In re CMS and Pietrangelo. Because there is no allegation that a price other than the prevailing market price for Radian stock was paid by any Plan participant, § 408(c)'s exemption applies, and this claim is dismissed.

4.   Duty to Monitor, Co-Fiduciary Liability, and
     <u>Vicarious Liability</u>

The plaintiff argues that the defendants, as fiduciaries, failed to review adequately the performance of other fiduciaries to ensure that they were fulfilling their duties under ERISA.  She also argues that the defendants are liable as co-fiduciaries under ERISA § 405.  <u>See</u> 29 U.S.C. § 1105.  Finally, she argues that Radian is vicariously liable for the breaches of fiduciaries under a theory of respondeat superior.  These claims necessarily depend upon the existence of breaches of fiduciary duties.  The Court has found that the complaint does not adequately state such breaches.  These derivative claims will be dismissed as well.

III. <u>Conclusion</u>

The allegations of the complaint, even if true, do not rebut the presumption of prudence to which the defendants are entitled or show violations of the duties of disclosure or loyalty.  The complaint fails to state a claim for breach of fiduciary duty and will be dismissed without prejudice.

An appropriate Order shall issue separately.