IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JEANETTE JOHNSON, Individually  :   CIVIL ACTION
and on Behalf of All Others     :
Similarly Situated              :
                                :
      v.                        :
                                :
RADIAN GROUP, INC., et al.      :   NO. 08-2007


MEMORANDUM

McLaughlin, J.                                    May 26, 2010

          Plaintiff Jeanette Johnson brings suit under § 502 of

the Employee Retirement Income Security Act ("ERISA") on behalf

of participants in the Radian Group, Inc. Savings Incentive Plan

("the Radian Plan" or "the Plan") whose accounts held company

stock or units in the Radian Common Stock Fund from February 6,

2007, through July 15, 2008.[1]  The defendants are Radian Group,

Inc. ("Radian"), the Radian Compensation and Benefits Committee

("Plan Committee" or "Committee"),[2] Sanford A. Ibrahim, C. Robert

Quint, Robert E. Croner, and Christine M. Kerly.[3]  The plaintiff

_____

          [1] In her initial complaint, the plaintiff set the class
period from November 6, 2006, to "the present."  The class
period in her amended complaint is as stated above.

          [2] In her initial complaint, the plaintiff named as
defendants the Radian Compensation and Benefits Committee and its
alleged alias, the Radian Compensation and Human Resources
Committee.  The defendants explained in their first motion to
dismiss that the committees are two separate entities.  In her
amended complaint, the plaintiff names only the Radian
Compensation and Benefits Committee.

          [3] In her initial complaint, the plaintiff named Stephen T.
Hopkins as a defendant.  Although the plaintiff includes Mr.

alleges that the defendants breached their fiduciary duties to prudently and loyally manage the Plan and to not mislead Plan participants about the risks associated with Radian stock in relation to Radian's investment in Credit-Based Asset Servicing and Securitization, L.L.C. ("C-BASS"). According to the plaintiff, Plan participants suffered substantial losses because of the defendants' fiduciary breaches, and she seeks to obligate the defendants to restore these losses to the Plan.

The plaintiff filed her class action complaint ("CAC") on April 29, 2008. On July 16, 2009, upon consideration of the defendants' motion to dismiss, the parties' briefs, and an oral argument on the motion, the Court dismissed the plaintiff's complaint without prejudice because the plaintiff failed to state a claim for breach of fiduciary duty. <u>Johnson v. Radian Group, Inc.</u>, No. 08-2007, 2009 U.S. Dist. LEXIS 61334 (E.D. Pa. July 17, 2009). The plaintiff then filed an amended class action complaint ("ACAC") on August 17, 2009, which the defendants move to dismiss.[4] Because the Court finds that the plaintiff has once again failed to allege a breach of fiduciary duty, the Court will grant the defendants' motion and dismiss this case with

---

Hopkins in the caption of her amended complaint, she does not assert any allegations against him.

[4] Since filing her ACAC, the plaintiff has withdrawn several allegations contained in it. The Court disregards these allegations and the arguments premised on them in deciding the defendants' motion.

prejudice.

I.    The Court's Earlier Decision[5]

     Radian is a credit enhancement company that offers
mortgage insurance and other financial services and products to
financial institutions, including mortgage lenders.  For the
purposes of ERISA, Radian is the "sponsor" of the Plan at issue.
Johnson, 2009 U.S. Dist. LEXIS 61334, at *5-6.

     The Plan is a 401(k) employee pension benefits plan
through which Radian employees have the option of making tax-
deferred contributions from their salary.  The company matches up
to 6% of the participants' eligible compensation.  The Plan is an
"eligible individual account plan" ("EIAP") within the meaning of
ERISA,[6] and a "defined contribution plan."  Id. at *6-7.

     In its earlier decision, the Court took notice of
several Plan documents[7] that explained that matching

---

[5] The Court incorporates its earlier decision herein.

[6] The Court noted in its previous decision that the parties
do not dispute that the Plan qualifies as an EIAP under ERISA.
The plaintiff does not appear to contest this characterization in
her ACAC.  See Pl.'s Opp. at 17-18.

[7] As stated in the Court's July 16 memorandum, on a motion
to dismiss, courts can consider the allegations of the complaint,
exhibits attached to the complaint, matters of public record, and
any undisputedly authentic document that a defendant attaches to
a motion to dismiss if the plaintiff's claims are based on the
document.  Lum v. Bank of Am., 361 F.3d 217, 222 n.3 (3d Cir.
2004); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,
998 F.2d 1192, 1196 (3d Cir. 1993).  The Court can also take
notice of a company's public filings with the SEC.  Oran v.

3

contributions are to be made in either cash or shares of Radian
stock, at the company's election.  All matching contributions,
however, "shall be invested in Company Stock until such time as
the Participant may transfer all or portion of Company Stock to
one or more" other investment media.  Since January 1, 2007, Plan
participants have been free to transfer all matching
contributions to the investment funds of their choice;
previously, they had to wait until their investments vested.
Participants were advised specifically in a "Summary of Material
Modifications" that they "should be aware that maintenance of a
diversified and balanced portfolio of plan investments can be a
key step towards ensuring long term retirement security."  Id. at
*7-8.

        The Court also took notice that Plan participants are
offered a range of investment options with more than twenty-five
different investment funds, including Radian company stock.  With
respect to investing in company stock, participants were warned
in an "Investment Policy Statement" that company stock

                is unique among the Plan's other investment
                options in that it invests solely in the
                common shares of Radian Group Inc.

Stafford, 226 F.3d 275, 289 (3d Cir. 2000).

        The defendants attached several documents to their motion
to dismiss the CAC, and they attach several documents to their
motion to dismiss the ACAC.  The Court will cite to documents
attached to the defendants' motion to dismiss the ACAC as "Defs.'
M. Ex. __."

> Investment in a single security poses both
> company-specific and industry/sector risks
> for participants.  The value of the stock can
> be greatly affected by issues that arise
> within Radian Group Inc. or within its
> industry.  Therefore, it is much more
> difficult to anticipate the risk
> characteristics of this option versus the
> diversified fund options available under the
> Plan.

Id. at * 8-9.  Participants were also advised that "investment funds are subject to varying degrees of risk due to market fluctuations," and the Plan does not guarantee any specific level of benefits:

> Contributions to the Radian Group Inc. Stock
> Fund will be used to purchase shares of the
> common stock of Radian Group Inc. at
> prevailing market prices. . . . The Fund is
> not diversified and its performance depends
> entirely on the performance of Radian Group
> Inc. Common Stock.  As with other stock, the
> value of Radian Group Inc. Common Stock will
> fluctuate and your investment in this Fund
> will increase or decrease accordingly.

Id. at *9-10.

Besides acting as the Plan's sponsor, Radian was also the "Plan Administrator" for purposes of ERISA, as was the Plan Committee.  As of January 1, 2007, the Plan was amended and Robert E. Croner became the Plan Administrator.  Both before and after the January 2007 amendments, however, the Plan Committee was the fiduciary responsible for selecting the investment options offered under the Plan.  Id. at *10-11.

During the class period, Radian engaged in three

business segments: (1) mortgage insurance, (2) financial
guaranty, and (3) financial services. Radian's financial
services segment consisted of interests held in Sherman Financial
Services Group, L.L.C. ("Sherman"), and C-BASS. Radian did not
wholly own C-BASS; rather, Radian held a 46% interest in C-BASS,
as did MGIC Investment Corporation ("MGIC"),[8] another provider of
private mortgage insurance. On February 6, 2007, Radian and MGIC
announced that they intended to merge, and as part of their
merger, they agreed to sell half of their combined interest in C-
BASS. Id. at *11-12, 14.

    According to the plaintiff, the subprime mortgage
crisis, coupled by C-BASS's business model, caused "a monumental
liquidity crisis" for C-BASS. Prior to and during the class
period, the subprime mortgage market deteriorated significantly,
giving rise to a material increase in mortgage loan defaults. C-
BASS was particularly vulnerable to these effects because C-BASS
did not originate the loans it serviced and securitized, and it
accepted the first risk of nonpayment. Id. at *12-13.

    The plaintiff alleged that, despite the danger of its
investment in C-BASS, Radian failed to disclose this danger to
the Plan or its participants. Instead, it made statements

---

    [8] The plaintiff was inconsistent in her CAC as to the
combined percentage owned by Radian and MGIC. In paragraph 85,
she indicated that this percentage was over 95, although in
paragraph 190, she asserted that it was 92.

indicating that its investment in C-BASS was strong, so as to inflate the price of Radian stock and not jeopardize the merger with MGIC.  Radian also continued to imprudently offer company stock as an investment option and to match employee Plan contributions with Radian stock.  Id. at *13-14, 28-29.

The CAC details several statements made by Radian, Ibrahim, and Quint in SEC filings and on conference calls with investors, which she argues are incorporated by reference into the Plan.  The statements related to Radian's third quarter, fourth quarter, and fiscal year results for 2006, and its first and second quarter results for 2007.  The statements also included Radian's Form 11-K annual report for the Plan filed with the SEC on June 29, 2007.  According to the plaintiff, the defendants failed to disclose in these statements that Radian's $468 million investment in C-BASS was materially impaired because C-BASS was receiving margin calls and C-BASS's investments were declining in value at a significant rate.  Id. at *15-24.

On July 30, 2007, Radian issued a press release announcing that the value of its investment in C-BASS was "materially impaired" as of July 29, 2007.  On July 31, 2007, C-BASS issued a press release that it met $290 million in lender margin calls during the first six months of 2007, and an additional $260 million in margin calls during the first 24 days of July.  MGIC issued a press release on August 7, 2007, that in

7

light of C-BASS's impairment, and despite Radian's disagreement, MGIC was not required to complete the pending merger with Radian.[9]  On October 2, 2007, Radian filed a Form 8-K with the SEC, announcing that Deloitte & Touche, L.L.P., who had previously served as Radian's independent auditor, declined to stand for reappointment for 2007.  On November 2, 2007, Radian filed a Form 8-K announcing that Radian would take an impairment charge on its entire investment in C-BASS.  It also announced that it could not be certain of the carrying value of a $50 million unsecured credit facility that it had provided to C-BASS. Id. at *24-28.

The Court granted the defendants' motion to dismiss because it found that the plaintiff failed to allege a breach of fiduciary duty based on the duties of prudence, disclosure, and loyalty.  As such, the Court dismissed the plaintiff's duty to monitor claim and her claims of co-fiduciary liability and vicarious liability, which were derivative of her fiduciary breach claims.  In dismissing the claims, the Court applied Rule 8(a) of the Federal Rules of Civil Procedure.  The plaintiff had alleged throughout the CAC that the defendants knew or recklessly ignored certain facts, which would ordinarily subject the plaintiff's complaint to the heightened pleading standards of

_____

[9] On September 5, 2007, Radian and MGIC jointly announced the termination of their pending merger.  Johnson, 2009 U.S. Dist. LEXIS 61334, at *26.

Rule 9(b) of the Federal Rules.  See, e.g., Urban v. Comcast

Corp., No. 08-773, 2008 U.S. Dist. LEXIS 87445, at *23-26 (E.D.

Pa. Oct. 28, 2008).  In her opposition brief and during oral

argument, however, the plaintiff specifically disavowed that she

alleged anything more than negligence, such that Rule 8(a)

governed.  Johnson, 2009 U.S. Dist. LEXIS 61334, at *30-33.

        With respect to the plaintiff's duty of prudence claim,

the Court first held that the presumption of prudence, as

articulated by the United States Court of Appeals for the Third

Circuit in Moench v. Robertson, 62 F.3d 553 (3d Cir. 1995),

applied to the defendants.  It explained the rationale and

workings of the presumption, noting that Moench struck a balance

between holding fiduciaries responsible while acknowledging their

special circumstances in managing plans that encourage investment

in employer stock.  In such instances, fiduciaries are entitled

to a presumption in the first instance that they acted

consistently with ERISA, and they are judged under an abuse of

discretion standard.  Johnson, 2009 U.S. Dist. LEXIS 61334, at

*34-43.

        In applying the presumption of prudence, the Court held

that the plaintiff failed to demonstrate that the defendants

"could not have believed reasonably that continued adherence to

the [Plan's] direction was in keeping with the settlor's

expectations of how a prudent trustee would operate."  Id. at

9

*40, 44 (quoting <u>Moench</u>, 62 F.3d at 571).[10]

First, the Court found that the plaintiff had failed to allege sufficient facts to demonstrate that C-BASS was facing a "monumental liquidity crisis," such that the defendants should have known that their investment in C-BASS was impaired before they announced as such on July 30, 2007. It was undisputed, and in fact, alleged, that C-BASS met its margin calls from lenders in the regular course of business up until the end of July 2007. To the extent that no liquidity crisis existed prior to the impairment announcement, the Plan fiduciaries could not have known of the alleged crisis, and their actions throughout the class period could not have been imprudent. <u>Id.</u> at *45-46.

Second, even if the CAC did demonstrate that C-BASS faced this crisis, the complaint did not establish that Radian's ongoing viability as a company was implicated. The plaintiff did not allege: (1) that the Plan fiduciaries failed to follow the Plan; (2) that the value of Radian's entire portfolio was impaired; (3) any information about the value of Radian's other investments; (4) any information about the value of Radian's

_____

[10] The defendants argued that because the Plan absolutely required investment in company stock, pursuant to the matching contributions provisions, the defendants' actions were beyond judicial review. The Court did not resolve whether a separate, more deferential standard of review applied for such plans because it found that the plaintiff's generalized allegations of wrongdoing were insufficient to rebut <u>Moench</u>'s abuse of discretion standard. <u>Johnson</u>, 2009 U.S. Dist. LEXIS 61334, at *43-44.

mortgage insurance and financial guaranty sectors; (5) any
information about Radian's investment in Sherman; or (6) any
information about the portion of Radian's business that C-BASS
constituted, or whether C-BASS was a primary investment.  Id. at
*46-48.

Third, any downward trend in the value of Radian stock
that may have coincided with the alleged impairment of Radian's
investment in C-BASS was not sufficient to establish that the
defendants abused their discretion.  Fiduciaries are not bound to
depart from ESOP or EIAP plan provisions whenever they are merely
aware of circumstances that may impair the value of company
stock.  Indeed, they may face liability if they divest the
employer's stock in an act of caution only to find that the
company stock then thrives.  Id. at *48 (citing Wright v. Ore.
Metallurgical Corp., 360 F.3d 1090, 1099 (9th Cir. 2004)); Id. at
*40.

The Court next dismissed the plaintiff's duty of
disclosure claim, which was premised on the defendants' alleged
failure to provide Plan participants with all material
information regarding the value of and the risks associated with
an investment in the Radian stock fund.  The plaintiff relied on
Radian's SEC filings and conference calls, which, she claimed,
failed to timely disclose the C-BASS impairment and inflated the

value of Radian stock.[11]

The Court held first that, because the plaintiff had failed to allege a monumental liquidity crisis at C-BASS, the defendants could not have been aware that their statements were allegedly misleading. Id. at *52.

Second, the allegedly misleading statements included in the CAC in fact advised investors of the market risks presented by the company's involvement in the subprime market. For example, Radian noted on its Form 10-K filed with the SEC on March 1, 2007, that "[a]s a holder of credit risk, our results are subject to macroeconomic conditions and specific events that impact the credit performance of the underlying insured assets." It warned that "the significant credit spread widening that has occurred in the subprime mortgage market . . . could produce . . . losses for C-BASS during the first quarter." Id. at *55-56.

Radian also reported in April 2007 that its income was down in its financial services segment "primarily as a result of an operating loss at C-BASS." It revealed C-BASS's losses in the first quarter for 2007, based on the "subprime mortgage market disruption," and noted that "C-BASS incurred a loss of

_____

[11] The defendants argued that the SEC filings, press releases, and statements to market analysts were not fiduciary communications and could not impose ERISA liability. The Court did not reach this issue because it found that the communications were insufficient to establish a breach of the duty of disclosure. Johnson, 2009 U.S. Dist. LEXIS 61334, at *52.

12

approximately $15 million as credit losses and credit spread widening in the subprime mortgage market impacted their results." Id. at *56-57.

Third, the Plan documents themselves explicitly advised participants that the Radian stock fund was non-diversified and that non-diversified portfolios presented risks. Such disclosures satisfied the defendants' obligations because the defendants did not have a further duty to "give investment advice" or "to opine on" the stock's condition. Id. at *53-55 (quoting Edgar v. Avaya, Inc., 503 F.3d 340, 350-51 (3d Cir. 2007)).

Fourth, the Court found uncompelling the plaintiff's "market surprise theory," which claimed that the defendants inflated the company stock, such that an earlier impairment announcement would have resulted in smaller losses for Plan participants. Courts have held under the "efficient capital markets hypothesis" that stockholders lose the same value of stock whether an announcement of adverse information is released earlier or later because the market makes a swift adjustment upon hearing the information. See Edgar, 503 F.3d at 350. The plaintiff alleged that the hypothesis was inapplicable in this instance because the defendants inflated the stock price, and thus their losses were greater than they would have been had the defendants announced the impairment earlier. Johnson, 2009 U.S.

Dist. LEXIS 61334, at *58-61.

The Court reasoned that even if the efficient capital markets hypothesis did not apply to inflated stock cases, the plaintiff had still failed to allege an earlier impairment of Radian's investment, such that she did not adequately support her artificial stock inflation claim. It also noted that because the plaintiff pled negligence, and not deliberate dissemination of false information, the disclosure claim became a variation of the prudence claim, which the Court already rejected. Id. at *61.

Next, the Court dismissed the plaintiff's duty of loyalty claim. It found that the plaintiff failed to allege that the defendants placed Radian's and their own interests above the interests of the Plan and its participants because first, the plaintiff did not sufficiently allege an earlier impairment of Radian's investment in C-BASS, such that there was no conflict of interest. Second, the plaintiff's complaint, based on a theory of negligence, could not support a conflict of interest claim, which implicitly requires the defendants to act with a purpose other than in the interest of Plan participants or beneficiaries. The fact that a fiduciary may have had interests adverse to those of plan participants does not alone state a claim for breach of fiduciary duty. Id. at *64-65.

The Court also found that the plaintiff failed to allege that the defendants engaged in "prohibited transactions"

by artificially inflating Radian stock, continuing the investment of Plan assets in the Radian stock fund, and withholding information about the true value of Radian's investment in C-BASS. The Court found that ERISA's prohibited transactions exemption under § 408 applied to the defendants because the securities were purchased at the prevailing market price, and therefore were "adequate consideration," based on the plain meaning of the term. Id. at *65-68.

Lastly, the Court dismissed the plaintiff's duty to monitor, co-fiduciary liability, and vicarious liability claims because the plaintiff had failed to plead a breach of fiduciary duty. The derivative claims were thus untenable. Id. at *68-69.

II. New Allegations in the Plaintiff's ACAC

The plaintiff provides several pages of new allegations in her ACAC to reassert her breach of fiduciary duty claims.[12] Specifically, these allegations relate to the plaintiff's prudence and disclosure claims.

A. The Duty of Prudence

The plaintiff's ACAC contains new allegations with

_____

[12] Many of these new allegations are verbatim repetitions of those made in the amended complaint of a related action, In re Radian Securities Litigation, Case No. 07-3375 (E.D. Pa.). Compare, e.g., In re Radian Sec. Litig. Am. Compl. ¶¶ 39-48, 49-57, 58-75, 76-87, 88-98, 115-27, 129-31, 133, 136-45, 148, 149, with ACAC ¶¶ 74-83, 84-92, 93-110, 111-20, 122-32, 139-43, 181-93, 194-203, 206, 208.

respect to the applicability of the presumption of prudence.  It
also contains new allegations meant to overcome the presumption,
should it apply.

### 1.    The Presumption of Prudence

The plaintiff adds several paragraphs that detail
various Plan documents, many of which the Court already
considered in its earlier decision.  See Lum v. Bank of Am., 361
F. 3d 217, 222 n.3 (3d Cir. 2004).  She notes that the Plan
requires Radian to appoint a plan administrator and that it has
the power to appoint the trustee.  She also notes that Defendant
Croner became the Plan Administrator on January 1, 2007,
Defendant Ibrahim was a member of the Plan Committee, and
Defendant Quint sat on C-BASS's Board of Managers.  ACAC ¶¶ 17,
25-26, 31, 37, 44.

The plaintiff next points to several Plan documents
that state that the Plan is a "retirement plan," and she asserts
that the primary purpose of the Plan is to save for retirement,
not to encourage investment in employer securities.  She quotes
that the Plan is "to help you prepare for retirement," "to
provide eligible employees . . . with the opportunity to save for
retirement," and that "the main objective of the Plan is to
provide for your future retirement security."  She states that
Radian shifted from a "defined benefit plan" to a "defined
contribution plan" in order to provide a "greater incentive for

16

you to save for your retirement." Id. ¶ 56; Pl.'s Opp. at 3.

Next, she reasserts that the Plan does not require investment in Radian stock. She supports this assertion by the fact that: (1) although the Company matches in company stock, it reserves the right to change the match to cash at a future date; (2) the Committee offers twenty-two investment options, one being the Radian stock fund, and will add, remove, or change them as may be appropriate; and (3) Radian reserves the right to change, modify, or discontinue the Plan.[13]  ACAC ¶¶ 60, 62, 69, 71-72.

### 2. Allegations to Rebut the Presumption of Prudence

The plaintiff adds several allegations to assert that even if the presumption of prudence applies, the defendants acted imprudently. These new allegations include facts about: (1) C-BASS's acquisition of Fieldstone Investment Corporation ("FIC") and its problems in light of the general subprime mortgage crisis, and (2) the relationship between Radian and C-BASS.

FIC was a mortgage real estate investment trust that invested in non-conforming loans originated by its wholly owned mortgage origination subsidiary, Fieldstone Mortgage Company. Its board of directors began to look into the potential sale of

_____

[13] The plaintiff originally made these arguments in her first opposition brief and at oral argument on the first motion to dismiss.  See CAC ¶¶ 64-65; Pl.'s 1st Opp. at 17-18 & n.14; Hr'g Tr. 77-80, Dec. 19, 2008.

the company because it was experiencing losses and "continued
negative trends" in delinquencies and prepayment fees on loans
originated in 2005 and 2006.  FIC began receiving margin calls in
the fourth quarter of 2006, and its liquidity continued to
decrease in 2007.  ACAC ¶¶ 146, 149, 150, 153, 155.

On February 16, 2007, FIC issued a press release that
C-BASS had agreed to acquire all of FIC's outstanding common
stock at a 112% premium over FIC's closing stock price.  On March
16, 2007, C-BASS agreed to purchase certain assets that were
expected to generate $100 million in liquidity for FIC.  On July
17, 2007, C-BASS acquired FIC for approximately $187 million,
including closing costs.[14]  The plaintiff alleges that C-BASS's
acquisition of FIC was "a substantial cause of the margin calls
that C-BASS received in 2007."  Id. ¶¶ 154, 157, 158, 221; Defs.'
M. Ex. 11 at 46; Pl.'s Opp. at 25.

The plaintiff also bolsters her allegations about C-
BASS's "risky" business model and the general subprime market.

---

[14] The plaintiff initially asserts in her ACAC that the
acquisition of FIC cost approximately $1.5 billion.  See ¶ 163.
In her brief in opposition, she clarifies that the acquisition
was for $187 million, but that C-BASS "assumed liability for
FIC's inventory of risky loans," valued at approximately $1.3
billion.  Pl.'s Opp. at 25.  The defendants counter that the
loans purchased from FIC were assets, and not liabilities.  They
also explain that the purchase would amount to only $287 million
at most, based on the purchase price of $187 million and the
expected sale of assets that would generate approximately $100
million in liquidity for FIC.  Defs.' M. Ex. 11 at 46; Defs.' M.
at 22-23; Defs.' Reply at 6.

18

She details that interest rates began to rise in 2004, and
property values began to decline, which adversely affected sub-
prime borrowers' abilities to pay their mortgages.  In 2006,
mortgage companies were closing or declaring bankruptcy, some of
which were the loan originators from which C-BASS purchased its
loans.  During this time, C-BASS experienced loan defaults and an
increase in investor rejections, particularly because it
purchased risky loans.  The plaintiff claims that the mortgage
crisis and C-BASS's business model were strong indicators to the
defendants that C-BASS would be adversely affected.  She also
notes that by the end of July, C-BASS had $299 million in unpaid
margin calls, rather than $99 million, as originally implied.
ACAC ¶¶ 111-20, 126-32, 165-92, 240.

        To demonstrate that the defendants should have known
about C-BASS's demise, she notes that Defendant Quint sat on C-
BASS's Board of Managers, and that Radian subleased office space
to C-BASS pursuant to a fifteen-year sublease agreement.  Radian
also financed the purchase of furniture for C-BASS's new offices.
Id. ¶¶ 138-39.

        The plaintiff also provides several new allegations
about Radian's composition and its relationship to C-BASS.  She
adds information about Radian's business segments based on
figures from 2006: the mortgage insurance segment represented 49%
of Radian's net income and 55% of its equity; the financial

guaranty segment represented 23% of Radian's net income and 34% of its equity; and the financial services segment, comprising Radian's investment in C-BASS and Sherman, equated to 28% of Radian's net income and 11% of its equity. She quotes Defendant Ibrahim, who stated that "C-BASS . . . is an important contributor to our earnings." In 2006, C-BASS accounted for 16% of Radian's earnings, and stockholders had approximately 10-12% of their equity invested in C-BASS in 2006 and 2007.[15]  Id. ¶¶ 87, 94, 134; Pl.'s Opp. at 12.

B.    The Duty of Disclosure

The plaintiff supplements her duty of disclosure claim with statements that allegedly omit or misstate information about the FIC acquisition and C-BASS's margin calls. She argues that these misstatements and omissions caused the Plan and its participants to hold and maintain Plan investments in Radian stock instead of in alternative investment options. She also argues that the misstatements and omissions inflated the value of company stock, causing a significant decline in the stock price upon the impairment announcement.

In terms of misstatements and omissions related to the

---

[15] The defendants contest the plaintiff's figures, arguing that the plaintiff's calculations are flawed and premised on uncomparable amounts. Defs.' M. at 9 & n.4; Defs.' Reply at 4 n.1. The Court need not resolve this issue because it finds that even if the plaintiff's numbers are correct, she still has failed to rebut the presumption of prudence.

FIC acquisition, the plaintiff alleges that the defendants should have disclosed that C-BASS's acquisition of FIC was a substantial cause of its margin calls because of FIC's financial state. She claims that the defendants materially omitted this information when Radian announced C-BASS's acquisition of FIC on March 1, 2007, in its 2006 Form 10-K, and on August 9, 2007, in its Form 10-Q for the quarter ending June 30, 2007. As such, she claims that Radian made misstatements when it claimed to maintain a "strict risk management culture" on a January 23, 2007, press release. ACAC ¶¶ 223-24, 226-29, 232-33, 236-37, 242-44.

With respect to C-BASS's margin calls, the plaintiff alleges that the Form 10-Qs filed on August 9, 2007, and on November 20, 2007, misstated the amount of the margin calls that C-BASS received and the amount it was unable to pay. These communications explained that C-BASS received $362.7 million in margin calls from July 1 through July 29, 2007, and that it paid $263.5 million of the calls as of the close of business on July 27, 2007. Radian's amendment to its 2007 Form 10-K, filed July 15, 2008, disclosed that C-BASS received approximately $584 million in margin calls in July 2007, $285 million of which C-BASS paid. Id. ¶¶ 238-41, 246-47.

III. Analysis

The Court incorporates the legal standard articulated in its earlier decision. It finds that the plaintiff has once

again failed to plead a breach of fiduciary duty, and it dismisses the ACAC with prejudice.

### A. The Duty of Prudence

The plaintiff's new allegations do not demonstrate the inapplicability of the presumption of prudence, nor do they rebut the presumption. As such, the plaintiff's duty of prudence claim is dismissed.

#### 1. The Presumption of Prudence

The plaintiff offers no new allegations for the Court to find that the presumption of prudence is inapplicable. First, with respect to the plaintiff's argument that the Plan's purpose is to help participants save for retirement, the goals of saving for retirement and encouraging employee ownership of a company are not mutually exclusive. An EIAP has two roles: to serve as a mechanism of corporate finance and a vehicle for retirement savings. Edgar, 503 F.3d at 346; Moench, 62 F.3d at 568-69. Indeed, the Plan is meant to do both, as Plan documents note not only retirement financing, but also the goal of employee ownership. When describing the Radian stock fund, the Plan states: "To ensure that participants share in the ownership of Radian, all Radian contributions are initially invested in Radian Group Inc. Company Stock." It further explains that the company stock fund "provides the participants with a means of

accumulating an ownership position in Radian in a tax-efficient and convenient way."  Def.'s M. Ex. 3 at 7.[16]

Second, the plaintiff misunderstands the Plan's matching contribution terms when arguing that the Plan does not require company stock investment.  As articulated by the defendants in their first motion to dismiss, at oral argument, and in their second motion to dismiss, and as already recognized by the Court in its earlier opinion, although matching contributions may be made initially in either cash or company stock, the contribution shall be immediately converted to company stock.  See, e.g., Defs.' M. Ex. 2 at 60 ("Matching Contributions shall be invested in Company Stock until such time as the Participant may transfer all or portion of Company Stock to one ore more Investment Media."); Hr'g Tr. 83, Dec. 19, 2008.  The plaintiff even quotes Radian documents in her opposition brief that acknowledge this requirement.  Pl.'s Opp. at 5 n.4

---

[16] To the extent that the plaintiff argues that Radian's switch from a "defined benefit plan" to a "defined contribution plan" makes the Plan more focused on retirement, she is mistaken. See Pl.'s Opp. at 3; ACAC ¶ 56.  The Court of Appeals for the Third Circuit has differentiated between a "defined benefit plan" and a "defined contribution plan," explaining that the former pays an annuity based on the retiree's earnings history and guarantees participants a fixed income at retirement.  The latter, however, does not guarantee a fixed income at retirement and instead provides benefits based solely on the amount that participants contribute.  See Edgar, 503 F.3d at 343 n.2 (citing 29 U.S.C. § 1002(34)) and Depenbrock v. CIGNA Corp., 389 F.3d 78, 80 n.1 (3d Cir. 2004)).

("Matching contributions, which may be made in Radian common stock or cash, are invested in the Radian Common Stock Fund.") (quoting Radian Form 11-K, June 29, 2007, at 6)).

Third, the Plan's offering of various stock funds and the Committee's ability to add, remove, or change stock fund options does not render the presumption inapplicable. Courts apply the presumption to plans that offer various investment options. See Edgar, 503 F.3d at 343 (applying presumption although plan offers twenty-three investment options).

The plaintiff attempts to distinguish Edgar by noting that the plan in Edgar provided that investment options "shall include the [Company] Stock Fund," whereas here, the Plan does not use the word "shall" when discussing fund offerings. See id. Rather, the Plan explains that these offerings are "any fund, contract, obligation, or other mode of investment to which a Participant may direct the investment of the assets of his Account, including Company Stock." Defs.' M. Ex. 2 at 9.

The Court finds this argument uncompelling. Although the Plan language may be different than that in Edgar, like Edgar, it encourages employee stock ownership. All matching contributions "shall" be made in company stock, such that the Plan requires, at least initially, employee investment in Radian. Compare Edgar, 503 F.3d at 345 ("In Moench, we held that fiduciaries . . . are entitled to judicial deference when they

decide to invest plan assets in the sponsoring company's stock."), with In re Schering-Plough Corp. ERISA Litig., 420 F.3d 231, 238 & n.5 (3d Cir. 2005) (holding Moench inapposite because plan merely permitted investment in company stock), and Urban, 2008 U.S. Dist. LEXIS 87445, at *35 (same).

Further, the fact that matching contributions shall be made in company stock appears to dictate that company stock be a constant investment fund option, and not one the Committee may remove. Were the company fund to be removed from the fund offerings, the entire Plan would require revision; the Plan mandates that matches be made in the Radian stock fund and remain there until a participant invests the stock elsewhere. See In re Bausch & Lomb, Inc. ERISA Litig., No. 06-CV-6297, 2008 U.S. Dist. LEXIS 106269, at *16-17 & n.4 (W.D.N.Y. Dec. 12, 2008) (finding requirement that matching and base contributions be invested in company stock fund demonstrative that company stock fund was not discretionary); see also Dann v. Lincoln Nat'l Corp., No. 08-5740, 2010 U.S. Dist. LEXIS 39045, at *23-24 (E.D. Pa. Apr. 20, 2010) (finding plan contemplated company stock as constant fund option based on holistic reading of plan).

Fourth, to the extent that the plaintiff argues that the inclusion of the Radian stock fund was discretionary because Radian had the right to amend the Plan, she is mistaken. As the Court previously held, such settlor functions are not subject to

review under ERISA's fiduciary provisions.  <u>Johnson</u>, 2009 U.S.

Dist. LEXIS 61334, at *48 (quoting <u>Hughes Aircraft Co. v.</u>

<u>Jacobson</u>, 525 U.S. 432, 444 (1999)).[17]

### 2. Application of the Presumption

As the Court articulated in its earlier decision, to

rebut the presumption of prudence, the plaintiff must demonstrate

that the defendants could not have believed reasonably that

continued adherence to the Plan's directions was in keeping with

the settlor's expectations of how a prudent trustee would

operate.  <u>Johnson</u>, 2009 U.S. Dist. LEXIS 61334, at *40.  The

facts alleged should depict the kind of "dire situation" that

would require plan fiduciaries to depart from the Plan's terms

requiring investment in company stock.  <u>Edgar</u>, 503 F.3d at 348-

49.  Courts applying the <u>Moench</u> presumption have stated that

there should be "persuasive and analytically rigorous facts

demonstrating that reasonable fiduciaries would have considered

themselves bound to divest."  <u>E.g.</u>, <u>Kirschbaum v. Reliant Energy,</u>

<u>Inc.</u>, 526 F.3d 243, 256 (5th Cir. 2008); <u>Morrison v. Moneygram</u>

_____

[17] The plaintiff also misstates that the <u>Moench</u> presumption
does not apply to EIAPs, and that the presumption cannot be
applied at the motion to dismiss stage.  Binding precedent
directly refutes the plaintiff's claims.  <u>Edgar</u>, 503 F.3d at 347-
48 ("EIAPs, like ESOPs, place employee retirement assets at much
greater risk than traditional ERISA plans.  Given these
similarities, we conclude that the underlying rationale of <u>Moench</u>
applies equally [to EIAPs].") (internal citations omitted); <u>id.</u>
at 349 & n.14 (rejecting argument that application of presumption
at motion to dismiss stage is inappropriate).

<u>Int'l, Inc.</u>, 607 F. Supp. 2d 1033, 1052 (D. Minn. 2009).

The plaintiff's new allegations regarding C-BASS's acquisition of FIC, its business model, and the subprime market, and regarding the relationship between C-BASS and Radian, fail to rebut the presumption that the defendants acted prudently.[18] First, the FIC acquisition does not demonstrate that C-BASS faced a "monumental liquidity crisis," or was on track to one, prior to Radian's announced impairment because all aspects relating to the intended merger were made public in March 2007. <u>See</u> Defs.' M. Ex. 11 at 24, 26; Ex. 12 at 13, 50.  This announcement was four months before C-BASS experienced its accelerated margin calls. Because publically disclosed information is immediately absorbed by the market, <u>Edgar</u>, 503 F.3d at 350, the acquisition could not have caused C-BASS's July liquidity problems.

Nor could the defendants have known that the acquisition would lead to C-BASS's demise.  The March announcement failed to generate any substantial change that could have triggered the defendants to act cautiously.  In fact, although C-BASS suffered losses in the first quarter of 2007, as

---

[18] The defendants again raise the argument that because the Plan required an investment in company funds, the defendants' actions are beyond judicial scrutiny.  Defs.' M. at 18 n.7.  They also again argue that Plan fiduciaries are shielded from prudence liability pursuant to § 404(c) of ERISA because the Plan gives participants an unfettered right to diversify their stock holdings.  Defs.' M. at 30-32.  The Court need not reach these issues because it finds that the plaintiff's ACAC fails to rebut the presumption of prudence.

the defendants disclosed, it returned to profitability in the second quarter, after the FIC acquisition was announced. Radian Group, Inc., Quarterly Report (Form 10-Q), at 17, 33, 36 (Aug. 9, 2007).[19]

Second, to the extent that the FIC acquisition "caused" C-BASS's margin calls, that C-BASS had a risky business model during an unstable time, and that C-BASS had $299 million in unmet margin calls by the end of July, the plaintiff has still failed to allege that C-BASS was facing a monumental liquidity crisis before Radian announced its impairment on July 30, 2007. The plaintiff cannot refute that C-BASS met $290 million in margin calls during the first six months of 2007, and it met an additional $285 million in margin calls during July in the normal course of business. ACAC ¶¶ 240. The Court already held that the margin calls themselves did not suggest that C-BASS was in a liquidity crisis prior to the announced impairment. The plaintiff's new allegations about the alleged cause or the eventual amount of these margin calls do not as well. See

_____

[19] The Court takes judicial notice of C-BASS's return to profitability in the second quarter of 2007, as demonstrated by Radian's Form 10-Q filed on August 9, 2007. Although the parties do not attach the Form 10-Q to their briefs, it is a publically filed document, and many of the plaintiff's allegations are premised on it. See Lum, 361 F.3d at 222 n.3; Oran, 226 F.3d at 289.

Johnson, 2009 U.S. Dist. LEXIS 61334, at *45-46.[20]

Third, even if C-BASS were facing a liquidity crisis, the plaintiff's new allegations about the relationship between Radian and C-BASS still fail to demonstrate that Radian's viability as a company was implicated, such that the fiduciaries should have reconsidered investing in company stock, despite the Plan's directive.  See Kirschbaum, 526 F.3d at 255.  As the plaintiff acknowledges, C-BASS, of which Radian held only a 46% interest, was only one part of Radian's smallest business segment, which comprised only 11% of Radian's total equity in 2006, and only 5% in 2007.  See Defs.' M. Ex. 7 at 6.  The plaintiff's bald assertions of C-BASS's "importance" to Radian are insufficient to show that Radian itself faced a dire situation because of C-BASS's financial circumstances.

Additionally, the ACAC does not cure the deficiencies that the Court recognized in its earlier decision with respect to the relationship between C-BASS and Radian.  Although the

---

[20] The Court also finds unpersuasive the plaintiff's new allegations meant to demonstrate that the defendants had "insider knowledge" about C-BASS's financial troubles.  Putting aside the fact that C-BASS met its margin calls in the regular course of business up until the end of July, Defendant Quint's membership on the C-BASS Board of Managers, and Radian's facilitation of office space and furniture for C-BASS are not rigorous and persuasive facts to show that the defendants should have been aware that C-BASS was impaired prior to Radian's July announcement.  Further, to the extent that C-BASS faced financial difficulties, the defendants reported as such, as found in the Court's previous opinion.  Johnson, 2009 U.S. Dist. LEXIS 61334, at *56-57.

plaintiff need not allege that Radian was on the brink of bankruptcy, she must demonstrate that it faced a "dire situation." See Edgar, 503 F.3d at 348-49 & n.13. The ACAC, however, lacks any facts about the value of Radian's other investments in its two other sectors, any information about Radian's investment in Sherman, and any allegations stating that the value of Radian's entire portfolio was impaired. See Johnson, 2009 U.S. Dist. LEXIS 61334, at *46-48.

The drop in Radian's stock price after the impairment announcement is insufficient in itself to rebut the Moench presumption. See Moench, 62 F.3d at 572 (finding precipitous decline in stock price, fiduciaries' knowledge of impending collapse, and conflict of interest may rebut presumption); see also Wright, 360 F.3d at 1099 (holding that decline in stock price over 70% insufficient); Kuper v. Iovenko, 66 F.3d 1447, 1451 (6th Cir. 1995) (holding 80% decline insufficient). Indeed, the entire mortgage market and the global economy at large faced a period of financial uncertainty during this time. Defs.' M. Exs. 10(A)-(G) (depicting downward trend of mortgage industry and global economy). Financial difficulties do not create a duty to halt or modify investments in company stock when the Plan requires such investments. Defendants who divest company stock under such circumstances expose themselves to potential liability if the stock rebounds. See Kirschbaum, 526 F.3d at 256; Edgar,

503 F.3d at 348-49.

Provided the public statements about the FIC acquisition, C-BASS's ability to meet margin calls through most of July in the regular course of business, and the lack of allegations to demonstrate that Radian itself faced a "dire situation," the Court finds that the plaintiff has not sufficiently rebutted the presumption of prudence.

B. Duty of Disclosure Claim

The Court finds that the plaintiff has also failed to state a claim for breach of the duty of disclosure. ERISA requires plan fiduciaries to inform plan participants of facts material to their investments, and it forbids fiduciaries from making material misrepresentations about the risks of a fund investment. Edgar, 503 F.3d at 350. A misrepresentation is material if there was "a substantial likelihood that if would have misled a reasonable participant in making an adequately informed decision about whether to place or maintain monies in a particular fund." Id.[21]

The plaintiff's disclosure claim is infirm because,

_____

[21] The defendants once again argue that the statements the plaintiff identifies as misleading are not fiduciary communications because they were made to the general public in the ordinary course of business in Radian's corporate capacity. Defs.' M. at 37-40. The Court need not resolve this issue because it finds that the statements themselves are insufficient to state a claim for breach of the duty of disclosure.

first, as the Court already explained, the plaintiff has not

adequately pled that C-BASS was impaired prior to July 29, 2007.

Nor has the plaintiff adequately alleged that the FIC

acquisition, coupled by C-BASS's business model and the subprime

mortgage market generally, alerted the defendants to C-BASS's

impending liquidity crisis.  To the extent that there was no

liquidity crisis prior to Radian's announcement, nor imminent

liquidity crisis of which the defendants knew or should have

known, the defendants could not have made the material

misrepresentations that the plaintiff alleges.

Second, the Court already found that, to the extent

that the defendants had a duty to notify participants about the

conditions of Radian stock, they adequately warned stockholders

of the market risks presented by the company's involvement in the

subprime market.  Johnson, 2009 U.S. Dist. LEXIS 61334, at *55-

58.  Although the statements in its SEC filings and to investors

did not disclose specific details about FIC's financial state or

the margin call amounts that C-BASS was receiving, it did

disclose the losses C-BASS experienced, and the details of C-

BASS's acquisition of FIC.

The plaintiff's reliance on subsequent statements about

the actual amount of C-BASS's margin calls in July to demonstrate

the inaccuracy of Radian's previous statements do not bolster the

plaintiff's disclosure claim.  The plaintiff does not allege that

Radian intentionally misstated the margin call amounts, nor that the defendants knew or should have known the proper sum prior to the amended Form 10-K. See In re RCN Litig., No. 04-5068, 2006 U.S. Dist. LEXIS 12930, at *37 (D.N.J. Mar. 21, 2006) (noting statements must be evaluated on information available at the time made and not in hindsight).[22]

Third, as the Court previously found, and as the plaintiff has not contested, the Plan informed its participants about the risks of investing in company stock. In the "Summary of Material Modifications," the Plan cautioned that participants "should be aware that maintenance of a diversified and balanced portfolio of plan investments can be a key step towards ensuring long term retirement security." Defs.' M. Ex. 13 at 4.

In the "Investment Policy Statement," it warned that "[i]nvestment in a single security poses both company-specific and industry/sector risks for participants." Company stock "can be greatly affected by issues that arise within Radian Group Inc. or within its industry." It is, therefore, "much more difficult to anticipate the risk characteristics of [the company stock] option versus the diversified fund options available under the

---

[22] In addition, the Court questions the materiality of this misstatement, in view of the fact that it does not support an argument for Radian taking an earlier impairment charge on its investment in C-BASS. The plaintiff still alleges that the accelerated margin calls, whether totaling $362 million or $584 million, were received in July 2007.

Plan." Defs.' M. Ex. 3 at 7. The Plan also advised participants to investigate their investment options and not to rely on Radian as their sole source of investment fund information. Id. at 3. These disclosures are sufficient at the motion to dismiss stage to satisfy the defendants' obligation not to misinform participants about the risks associated with investing in company stock. See Edgar, 503 F.3d at 350-51.

Fourth, the plaintiff's restated market surprise theory remains unsupported. The theory requires the plaintiff to sufficiently allege that the defendants deliberately inflated the price of company stock. See Johnson, 2009 U.S. Dist. LEXIS 61334, at *61-62; In re Merck & Co. Sec., Deriv., & "ERISA" Litig., MDL No. 1658, 2009 U.S. Dist. LEXIS 22923, at *17-18 (D.N.J. Mar. 23, 2009) (relying on active dissemination of knowingly false information to find efficient capital markets hypothesis inapplicable); In re Honeywell Int'l ERISA Litig., No. 03-1214, 2004 U.S. Dist. LEXIS 21585, at *42-43 (D.N.J. Sept. 14, 2004) (relying on defendants concealing and misrepresenting material information to find efficient capital markets hypothesis inapplicable). Here, however, the plaintiff has not adequately alleged that Radian's investment in C-BASS was impaired prior to the announcement made on July 30, 2007, such that the company stock traded at an inflated price. Nor has she alleged that the defendants acted with deliberateness; her amended complaint is

almost entirely stripped of all references to intentional conduct. <u>Compare</u> ACAC ¶¶ 109-10, 165, 192, 221, 229, 231 (asserting negligence), <u>with</u> CAC ¶¶ 105-06, 127-36 (asserting knowledge, recklessness, and intentionality).

     C.   <u>Duty of Loyalty</u>

The plaintiff does not plead any new facts to support her claim of a breach of the duty of loyalty. Indeed, the ACAC includes boilerplate legal conclusions from the CAC, but it omits almost all allegations to demonstrate a conflict of interest and intentional misconduct. <u>See</u> <u>id.</u> Because unsupported legal conclusions cannot form the basis for liability, the plaintiff's duty of loyalty claim is dismissed. <u>See</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).

The plaintiff argues in her opposition brief that the defendants had a conflict of interest because their salaries and incentive compensation were based on Radian's perceived success. Pl.'s Opp. at 58-59. Putting aside the fact that the plaintiff omitted these allegations in her ACAC, without further allegations of intentional misconduct, the assertions are insufficient to state a breach of loyalty claim. <u>See</u> <u>Trenton v. Scott Paper Co.</u>, 832 F.2d 806, 809 (3d Cir. 1987) (holding that fiduciary's adverse interests alone insufficient to show breach of duty of loyalty); <u>see also</u> <u>Woods v. Southern Co.</u>, 396 F. Supp. 2d 1351, 1368 (N.D. Ga. 2005) (finding duty of loyalty claim

sufficient because plaintiff alleged malfeasance); In re
WorldCom, Inc. ERISA Litig., 263 F. Supp. 2d 745, 768 (S.D.N.Y.
2003) (finding company stock ownership and participation in
compensation program insufficient to state a duty of loyalty
claim).

      D.   Derivative Liability

      Because the Court finds once again that the plaintiff
has failed to plead a breach of fiduciary duty claim, her claims
regarding a duty to monitor, co-fiduciary liability, and
vicarious liability must be dismissed as well.

IV.  Conclusion

      For the reasons herein stated, the defendants' motion
to dismiss the amended class action complaint is granted.

      The Court dismisses this action with prejudice.  It has
already allowed the plaintiff to amend her complaint once, and it
provided her with an extended period to brief her opposition to
the defendants' motion.  Further, the plaintiff had the benefit
of the pleadings and briefs from a related action, In re Radian
Securities Litigation, Case No. 07-3375 (E.D. Pa.), which she
relied upon in her amended complaint.